Slip Op. 06-132

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————————— :

FORMER EMPLOYEES OF
    BMC SOFTWARE, INC.,          :

                  *Plaintiffs*,    :

                              :      Court No. 04-00229

                  v.          :

UNITED STATES SECRETARY OF LABOR,   :

                 *Defendant*.    :

—————————————————————————— :

[Revised Determination on Remand, certifying workers as eligible to apply for Trade Adjustment Assistance benefits, is sustained.]

Decided: August 31, 2006

      Miller & Chevalier Chartered (Alexander D. Chinoy, Hal S. Shapiro, Myles S. Getlan, Daniel Lewis, and Owen Bonheimer), for Plaintiffs.

      Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Michael D. Panzera); Charles D. Raymond, Associate Solicitor for Employment and Training Legal Services, Office of the Solicitor, U.S. Department of Labor (Stephen R. Jones), Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

      In this action, former employees of Houston, Texas-based BMC Software, Inc. ("the Workers") contest the determination of the U.S. Department of Labor denying their petition for certification of eligibility for trade adjustment assistance ("TAA") benefits. *See* Letter to Court from A. Blummer, dated June 1, 2004 ("Complaint"); 69 Fed. Reg. 6694, 6695 (Feb. 11, 2004) (notice of receipt of petition and initiation of investigation); 69 Fed. Reg. 11,887, 11,888 (March 12, 2004)

(notice of denial of petition); 69 Fed. Reg. 20,642 (April 16, 2004) (notice of denial of request for reconsideration); A.R. 2-33, 44-45, 53, 56-59.[1] Jurisdiction lies under 28 U.S.C. § 1581(d)(1) (2000).[2]

Now pending before the Court is the Labor Department's Notice of Revised Determination on Remand ("Revised Remand Determination"), which certifies that:

> All workers of BMC Software, Inc., Houston, Texas, who became totally or partially separated from employment on or after December 23, 2002, through two years from the issuance of this revised determination, are eligible to apply for Trade Adjustment Assistance under section 223 of the Trade Act of 1974.

69 Fed. Reg. 76,783, 76,784 (Dec. 22, 2004). The Workers have advised that they are satisfied with that certification, albeit with certain reservations.

Accordingly, with the observations and clarifications set forth below, the Labor Department's Revised Remand Determination is sustained.

---

[1]The administrative record in this case consists of two parts – the initial Administrative Record (which the Labor Department filed with the court after this action was commenced), and the Supplemental Administrative Record (which was filed after the Labor Department's post-remand certification of the Workers).

The two parts of the administrative record are separately paginated; both parts include confidential business information. Citations to the public record are noted as "A.R. ____" and "S.A.R. ____," as appropriate, while citations to the confidential record are noted as "C.A.R. ____" and "C.S.A.R. ____."

[2]Except as otherwise indicated, all statutory citations are to the 2000 version of the United States Code.

## I.  **Background**

A.  The Trade Adjustment Assistance Laws

Trade adjustment assistance ("TAA") programs historically have been – and today continue to be – touted as the *quid pro quo* for U.S. national policies of free trade.  *See generally* Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor, 27 CIT ____, ____, 298 F. Supp. 2d 1338, 1349-50 (2003) ("Chevron III") (summarizing policy underpinnings of trade adjustment assistance laws).[3]

---

[3]*See also* Erika Kinetz, "Trading Down: The U.S. Shortchanges Its Outsourced Workers," Harper's Magazine, July 2005, at 62 ("Harper's Magazine") ("For more than forty years, [TAA's] real success has been as a political tool: it has kept America from the precipice of protectionism and helped to preserve the root of the very injustice it was meant to heal. . . . For many Republicans, economists, and corporate executives, [the cost of the TAA program] is a small price to pay for keeping free trade politically feasible."), 63 (in its inception, TAA "served a prominent political function: it was created in order to win AFL-CIO support for the Trade Expansion Act of 1962, which led to broad tariff reductions."); Lori G. Kletzer and Howard Rosen, "Easing the Adjustment Burden on U.S. Workers," in The United States and the World Economy: Foreign Economic Policy for the Next Decade 316-20 (2005) ("Kletzer & Rosen") (noting, *inter alia*, that programs for assistance to displaced workers have been motivated in part by "social and political factors," that Congress has used granting of trade negotiating authority as an "opportunity to compensate U.S. workers potentially adversely affected by any resulting changes in foreign competition," that the U.S. Trade Representative "has long supported TAA as a means for winning congressional support for trade negotiating authority," that expansions of TAA programs historically "have been highly correlated with congressional consideration of trade-liberalizing legislation," that TAA has been considered "as a *quid pro quo* for support on trade-liberalizing legislation," and that the inclusion of TAA reform measures in the Trade Act of 2002 – which renewed the President's trade promotion authority (an early, high priority of the then-new Administration) – "helped secure the votes necessary to pass the Trade Act"); Mike Dorning, "Trade Assistance Programs Fall Short," *Chicago Tribune*, Oct. 8, 2005 ("*Chicago Tribune*") ("During the election campaign and again this summer as the Bush administration fought for a free trade agreement with Caribbean countries, the White House regularly extolled its efforts [*i.e.*, the availability of TAA] on behalf of American workers who lose their jobs to foreign competition.").

Although TAA was originally "created in order to win AFL-CIO support" for free trade legislation, the program no longer enjoys the broad support of organized labor.  A recent analysis in Harper's Magazine explained:

As UAW v. Marshall explains, "much as the doctrine of eminent domain requires compensation when private property is taken for public[use]," the trade adjustment assistance laws similarly reflect the country's recognition "that fairness demand[s] some mechanism whereby the national public, which realizes an overall gain through trade readjustments, can compensate the particular . . . workers who suffer a [job] loss." UAW v. Marshall, 584 F.2d 390, 395 (D.C. Cir. 1978).[4]

In short, absent TAA programs that are adequately funded and conscientiously administered, "the costs of a federal policy [of free trade] that confer[s] benefits on the nation as a whole would

> TAA has always been a political *quid pro quo* – a little TAA for a lot of trade – that has worked to keep markets open.
>
> But as job growth remains weak and the U.S. current-account deficit continues to swell, this trade-off looks increasingly unfavorable to unionized labor, which has long decried TAA as "burial insurance."

Harper's Magazine at 63-64. *See also*, *e.g.*, Kletzer & Rosen at 317-18 (Unions "have always feared that supporting TAA could be seen as weakening their position against trade liberalization. TAA's link to job loss and the modest amount of assistance have led unions to characterize TAA as 'burial insurance'"); Megan Barnett, "Starting Over," U.S. News & World Report, May 31, 2004, at 49 ("TAA is a program with little political support. Because retraining displaced workers is an integral part of trade policy, antitrade constituents like unions don't actively advocate it.").

[4]*See* Brad Brooks-Rubin, "The Certification Process for Trade Adjustment Assistance: Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. 797, 798 n.10 (2005) ("Certifiably Broken") (and sources cited there) ("The basic economic policy premise for TAA is to ease the costs borne by certain workers as a result of trade liberalization. While trade liberalization provides significant opportunities for many sectors of the American economy, inevitably certain sectors suffer. TAA and other adjustment initiatives were created as a means to assist those bearing the burden of freer trade."); *Chicago Tribune* ("Although most economists believe that the nation as a whole benefits from freer trade, as consumers gain access to cheaper imports and exporters gain larger markets, the costs are high for workers who lose their jobs in the process. Partly to lighten the burden on those put out of work for the greater good and partly to counter union opposition to free trade deals, Congress has provided for some type of assistance to workers dislocated by foreign trade since the 1960s.").

be imposed on a minority of American workers" who lose their jobs due to increased imports and

shifts of production abroad. *Id. See also* Former Employees of Bell Helicopter Textron v. United

States, 18 CIT 323, 328-29 (1994) (summarizing policy underpinnings and legislative history of

TAA). Thus, as a recent article in Harper's Magazine explained, "[w]hen he introduced TAA,

President Kennedy justified the program in moral terms":

> "Those injured by [trade] competition should not be required to bear the full brunt
> of the impact. Rather, the burden of economic adjustment should be borne in part
> by the federal government . . . [T]here is an obligation to render assistance to those
> who suffer as a result of national trade policy."

Harper's Magazine at 63 (*quoting* Kennedy).

The trade adjustment assistance laws are generally designed to assist workers who have lost

their jobs as a result of increased import competition from – or shifts in production to – other

countries, by helping those workers "learn the new skills necessary to find productive employment

in a changing American economy." Former Employees of Chevron Prods. Co. v. U.S. Sec'y of

Labor, 26 CIT 1272, 1273, 245 F. Supp. 2d 1312, 1317 (2002) ("Chevron I") (*quoting* S. Rep.

No.100-71, at 11 (1987)). As expanded in 2002,[5] today's TAA program entitles eligible workers[6]

---

[5]The TAA program was initially established by Congress and the Kennedy Administration under the Trade Expansion Act of 1962 (Pub. L. 87-794), to provide assistance to workers who lost their jobs due to increased import competition. The program was substantially modified by the Trade Act of 1974 (Pub. L. 93-618), and – *inter alia* – eligibility requirements were relaxed to some degree. In 1981, assistance was reduced – *e.g.*, income support was reduced from the average manufacturing wage to the prevailing unemployment insurance rate, and made conditional on enrollment in training in certain circumstances (a requirement which was further tightened in 1988). Then, in 1993, Congress enacted the North American Free Trade Agreement Implementation Act (Pub. L. 103-182), creating a separate NAFTA-TAA program specifically targeting workers displaced as a result of trade with Canada and Mexico. *See generally* GAO-04-1012, "Trade Adjustment Assistance: Reforms Have Accelerated Training Enrollment, but Implementation Challenges Remain," Sept. 2004, at 6 ("GAO Report 04-1012"); GAO-01-838, "Trade Adjustment Assistance: Experiences of Six Trade-Impacted Communities," Aug. 2001, at 5 ("GAO Report 01-

_____

838"); Kletzer & Rosen at 316-18; Harper's Magazine at 63; "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 802 & n.25; United Shoe Workers of America, AFL-CIO v. Bedell, 506 F.2d 174, 181-82 (D.C. Cir. 1973) (tracing legislative history of Trade Expansion Act of 1962); Fortin v. Marshall, 608 F.2d 525, 528 (1st Cir. 1979) (summarizing history of 1974 Act, in light of 1962 legislation).

However, the TAA Reform Act of 2002 (part of the Trade Act of 2002) effected what are – by any measure – the most sweeping reforms of trade adjustment assistance since its inception in 1962. *See* Pub. L. 107-210, 116 Stat. 933 (2002). Among other things, the TAA Reform Act consolidated the TAA and NAFTA-TAA programs into a single TAA program, reduced the time for a Labor Department determination on a petition to 40 days, increased the maximum number of weeks of TRA payments available (to match the maximum number of weeks of training available), added new benefits (including the Health Coverage Tax Credit), and expanded eligibility to include additional secondary workers and additional workers affected by shifts in production (beyond those affected by trade with Canada and Mexico, some of whom were eligible for NAFTA-TAA benefits). *See generally* GAO Report 04-1012 at 7-11 (including Table 1, "Major Changes in the TAA Reform Act of 2002," a side-by-side comparison of the existing TAA program with the provisions of the predecessor TAA and NAFTA-TAA programs); Kletzer & Rosen at 319-21; Harper's Magazine at 63; "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 802.

In addition, the TAA Reform Act of 2002 established as a demonstration project a wage insurance benefit for older workers, known as the Alternative Trade Adjustment Assistance ("ATAA") program. ATAA allows workers aged 50 or older, for whom retraining may not be appropriate, to accept reemployment at a lower wage and receive a wage subsidy. Workers who qualify for ATAA are eligible to receive 50% of the difference between their new and old wages, up to a maximum of $10,000 over two years. *See generally* GAO Report 04-1012 at 2, 10. Older trade affected workers are eligible for ATAA only if the TAA petition filed with the Labor Department specifically requested ATAA certification. *Id*. The petition at issue here did not.

[6]For a table succinctly summarizing "TAA Eligibility Requirements," *see* GAO Report 04-1012 at 12 (Table 2).

The criteria for TAA certification as "production workers" are codified at 19 U.S.C. § 2272:

(a)     In general

        A group of workers . . . shall be certified . . . as eligible to apply for adjustment assistance . . . if the Secretary determines that –

        (1)     a significant number or proportion of the workers in such workers' firm, or an appropriate subdivision of the firm, have become . . . separated . . . ; and

to receive benefits which may include employment services (such as career counseling, resume-

writing and interview skills workshops, and job referral programs), vocational training, job search

and relocation allowances, income support payments (known as "Trade Readjustment Allowance"

or "TRA" payments), and a Health Insurance Coverage Tax Credit. *See generally* 19 U.S.C. § 2272

---

(2)    (A)    (i)    the sales or production, or both, of such firm or subdivision have decreased absolutely;

(ii)    imports of articles like or directly competitive with articles produced by such firm or subdivision have increased; and

(iii)    the increase in imports described in clause (ii) contributed importantly to such workers' separation or threat of separation and to the decline in the sales or production of such firm or subdivision; or

(B)    (i)    there has been a shift in production by such workers' firm or subdivision to a foreign country of articles like or directly competitive with articles which are produced by such firm or subdivision; and

(ii)    (I)    the country to which the workers' firm has shifted production of the articles is a party to a free trade agreement with the United States;

(II)    the country to which the workers' firm has shifted production of the articles is a beneficiary country under the Andean Trade Preference Act . . . , African Growth and Opportunity Act . . . , or the Caribbean Basin Economic Recovery Act . . . ; or

(III)    there has been or is likely to be an increase in imports of articles that are like or directly competitive with articles which are or were produced by such firm or subdivision.

19 U.S.C. § 2272 (Supp. II 2002).

Trade-affected workers who are not eligible for certification as "production workers" under 19 U.S.C. § 2272(a) may be eligible for certification as "secondary workers" if they produced component parts for another production firm that has experienced TAA-certified layoffs, or if they performed final assembly or finishing work for such a firm. *See* 19 U.S.C. § 2272(b) (Supp. II 2002). Alternatively, displaced workers may be eligible for certification as "service workers." *See* n.15, *infra* (discussing criteria for certification as "service workers"); Abbott v. Donovan, 6 CIT 92, 100-01, 570 F. Supp. 41, 49 (1983) (discussing early history of TAA coverage for "service workers").

*et seq.* (2000 & Supp. II 2002).[7]  Since 1974, the Labor Department has been entrusted with the

administration of the trade adjustment assistance program.[8]

_____

[7]The TAA Reform Act of 2002 established for the first time a trade adjustment assistance program targeting farmers and fishermen, commonly known as "Agricultural TAA."  *See generally* 19 U.S.C. § 2401 *et seq.* (Supp. II 2002).  That program is administered not by the Labor Department, but by the U.S. Department of Agriculture.

[8]For the first 12 years of the program's existence, the International Trade Commission ("ITC") was charged with administering trade adjustment assistance.  Congress transferred that responsibility to the Labor Department in 1974, concerned that relatively few workers had been certified as eligible for benefits by the ITC, and that "the program . . . often functioned in such a manner that its objectives were frustrated."  *See generally* Patricia M. McCarthy, "Origins of Judicial Review of Trade Adjustment Assistance Determinations," Litigating Trade Adjustment Assistance Cases Before the United States Court of International Trade, Customs & International Trade Bar Association and American Bar Association seminar, Princeton Club, New York, NY, April 19, 2005, at 2-4 ("McCarthy") (tracing the history of TAA program) (citations omitted); UAW v. Marshall, 584 F.2d at 395 (explaining that "[a] primary purpose of the Trade Act of 1974 was to make worker adjustment assistance more readily available than it had been under the Trade Expansion Act of 1962," and that "[f]or the first seven years of the earlier [TAA] program, no workers were found eligible for the program's benefits.") (footnotes omitted); Fortin v. Marshall, 608 F.2d at 528 & n.3 (noting that, due to determination by Congress that original TAA program had been "ineffective," 1974 legislation established new program and transferred administration to Labor Department); Woodrum v. Donovan, 4 CIT 46, 49-51 & n.1, 544 F. Supp. 202, 204-05 & n.1 (1982) (discussing Labor Department's assumption of ITC's duties *vis-a-vis* TAA program; also noting that jurisdiction over review of agency TAA determinations was transferred from U.S. Courts of Appeals to U.S. Court of International Trade as of November 1, 1980).

Although the Labor Department's portfolio has now included TAA for more than three decades, some commentators have criticized the agency for treating the program as a "stepchild." *See*, *e.g.*, Kletzer & Rosen at 318 (reporting that the Labor Department "has only reluctantly administered the program and has never promoted expansion or reform"); "Analysis & Perspective: Trade Court's Critique of Labor Department Places Spotlight on Handling of TAA Claims," BNA Int'l Trade Reporter, May 6, 2004, at 797 ("Analysis and Perspective") (*quoting* "former Democratic Senate aide on trade issues" who described TAA as an "orphan program," stating that "[t]he Labor Department has big policy intentions with TAA but [the agency's] implementation has been inconsistent and weak.").

One analysis attributes the Labor Department's ambivalence at least in part to the fact that "TAA requires higher levels of energy and resources to administer than other dislocated-worker programs . . . , due to its petition and eligibility process and its wider range of assistance services.

The trade adjustment assistance laws are remedial legislation and, as such, are to be construed broadly to effectuate their intended purpose. UAW v. Marshall, 584 F.2d at 396 (noting the "general remedial purpose" of TAA statute, and that "remedial statutes are to be liberally construed"). *See also* Fortin v. Marshall, 608 F.2d at 526, 529 (same); Usery v. Whitin Machine Works, Inc., 554 F.2d 498, 500, 502 (1st Cir. 1977) (emphasizing "remedial" purpose of TAA statute).[9]

Moreover, both "[b]ecause of the *ex parte* nature of the certification process, and the *remedial purpose* of the [TAA] program," the Labor Department is obligated to "conduct [its] investigation with *the utmost regard* for the interest of the petitioning workers." Local 167, Int'l Molders and Allied Workers' Union, AFL-CIO v. Marshall, 643 F.2d 26, 31 (D.C. Cir. 1981) (emphases added). *See also* Stidham v. U.S. Dep't of Labor, 11 CIT 548, 551, 669 F. Supp. 432, 435 (1987) (*citing* Abbott v. Donovan, 7 CIT 323, 327-28, 588 F. Supp. 1438, 1442 (1984) (quotations omitted)); IBM, 29 CIT at ____, 403 F. Supp. 2d at 1314 (*quoting* Stidham); Former Employees of Computer Sciences Corp. v. U.S. Sec'y of Labor, 29 CIT ____, ____, 366 F. Supp.2d

_____

From a purely administrative perspective, the [Labor Department] would prefer to administer a single program for all workers regardless of the cause of dislocation." Kletzer & Rosen at 318.

[9]*See also* Former Employees of Computer Sciences Corp. v. U.S. Sec'y of Labor, 30 CIT ____, ____, 414 F. Supp. 2d 1334, 1343 (2006); Former Employees of International Business Machines Corp., 29 CIT ____, ____ & n.3, 403 F. Supp. 2d 1311, 1314 & n.3 (2005) (citations omitted) ("IBM"); Former Employees of Merrill Corp. v. United States, 29 CIT ____, ____, 387 F. Supp. 2d 1336, 1342 (2005) ("Merrill Corp. II"); Former Employees of Electronic Data Sys. Corp. v. U.S. Sec'y of Labor, 28 CIT ____, ____, 350 F. Supp. 2d 1282, 1290 (2004) ("EDS I"); Former Employees of Ameriphone, Inc. v. United States, 27 CIT ____, ____, 288 F. Supp. 2d 1353, 1355 (2003) (citations omitted); Former Employees of Champion Aviation Prods. v. Herman, 23 CIT 349, 352 (1999) ("Champion Aviation I") (citations omitted) (NAFTA-TAA statute is remedial legislation, to be construed broadly); Chevron I, 26 CIT at 1274, 245 F. Supp. 2d at 1318 (citations omitted) (same).

1365, 1371 (2005)

Thus, while the Labor Department is vested with considerable discretion in the conduct of its investigation of trade adjustment assistance claims, "there exists a threshold requirement of reasonable inquiry." Former Employees of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Labor, 17 CIT 126, 130, 814 F. Supp. 1111, 1115 (1993) ("Hawkins Oil & Gas II"); Former Employees of Electronic Data Sys. Corp. v. U.S. Sec'y of Labor, 29 CIT ____, ____, 408 F. Supp. 2d 1338, 1342-43 (2005); Merrill Corp. II, 29 CIT at ____, 387 F. Supp. 2d at 1345. Courts have not hesitated to set aside agency determinations which are the product of perfunctory investigations.[10] *See generally*

---

[10]*See*, *e.g.*, Ameriphone, 27 CIT at ____ n.3, 288 F. Supp. 2d at 1355 n.3 (cataloguing numerous opinions criticizing Labor Department's handling of TAA cases).

*See also* Former Employees of IBM Corp., Global Services Division v. U.S. Sec'y of Labor, 29 CIT ____, ____, ____, 387 F. Supp. 2d 1346, 1350-51, 1353 (2005) ("IBM I") (agency's investigation was "merely perfunctory," and petition was denied based on only "scant evidence"; action remanded to agency with instructions to supplement "shockingly thin" record of investigation); Former Employees of Murray Engineering, Inc. v. Chao, 28 CIT ____, ____, ____ n.10, 358 F. Supp. 2d 1269, 1274, 1275 n.10 (2004) ("Murray Engineering II") (agency's determination both "betrays . . . [any] understanding of the industry it is investigating and the requirements of the [TAA statute]" and "failed to make reference to relevant law . . . , including Labor's own regulations on the matter"; and, although agency was granted three extensions of time to file results of second remand, remand results nevertheless still failed to comply with court's remand instructions); EDS I, 28 CIT at ____, 350 F. Supp. 2d at 1290 (in addition to grave flaws in agency's factual investigation, agency's interchangeable use of distinctly different terms renders its conclusion "hardly discernible" and "neither persuasive nor careful"); Former Employees of Tyco Electronics v. U.S. Dep't of Labor, 28 CIT ____, ____, 350 F. Supp. 2d 1075, 1089 (2004) ("Tyco IV") ("Labor repeatedly disregarded evidence of critical facts," "refused to accept information submitted by [the petitioning workers], which allegedly contradicted statements made by [company] officials," "rel[ied] on incomplete and allegedly contradictory information to support its position," and ultimately "failed to provide any analysis regarding the change in its position to certify [the workers] as eligible"); Former Employees of Ericsson, Inc. v. U.S. Sec'y of Labor, 28 CIT ____, ____, 2004 WL 2491651 at * 5 (2004) ("Ericsson I") (agency's finding "is not only unsupported by substantial evidence, but is . . . contradicted by the scant evidence" that exists); Former Employees of Sun Apparel of Texas v. U.S. Sec'y of Labor, 28 CIT ____, ____, 2004 WL 1875062 at ** 6-7 (2004) ("Sun Apparel I") (because "Labor never acknowledged its receipt of [the workers'] petition

section II.E, *infra* (summarizing statistics concerning TAA actions filed with Court of International Trade in recent years, and noting that – at least during four year period analyzed – Labor Department never successfully defended a denial without at least one remand).

## B. The Facts of This Case

The Workers' former employer, BMC, is a "Fortune 1000" company, and one of the largest software vendors in the world. Among other things, BMC designs, develops, produces and sells business systems management software, which is distributed both in "object code" form and on a "shrink-wrap" basis. BMC's competitors include industry giants and household names such as IBM, Computer Associates, Microsoft, Sun Microsystems, and Hewlett Packard. S.A.R. 33-36, 52-61; C.S.A.R. 153; *see also* C.S.A.R. 488, 490-91, 492, 493 (relevant portions of Form 10-K for BMC (for FY ended March 31, 2003)) ("BMC Form 10-K").

The four former employees who filed the TAA petition at issue here were involved in the production and distribution of BMC software products. Those products were mass-replicated at the

_____

and wholly failed to initiate an investigation thereof," "the displaced workers' claims were ignored for over three months"; once initiated, "[t]he entire investigation consisted of two communications with only one individual, [the company's] HR manager"; and even "the investigation upon [the workers' request for] reconsideration was perfunctory at best"); Chevron III, 27 CIT at ____, 298 F. Supp. 2d at 1348-49 ("[w]hether as a result of overwork, incompetence, or indifference (or some combination of the three), the Labor Department – for almost four years – deprived the [w]orkers . . . of the job training and other benefits to which they are entitled"); Ameriphone, 27 CIT at ____, 288 F. Supp. 2d at 1358-59 ("the entirety of the Labor Department's initial investigation consisted of forwarding the standard [form questionnaire]" to company official, with no follow-up by the agency, "even though the company's responses . . . were, in a number of instances, ambiguous or inconsistent, and called for clarification"; "Moreover, the agency's investigation conducted in response to the Workers' request for reconsideration was little more than a rubber-stamp of its initial Negative Determination," "consist[ing] – in toto – of two phone conversations with company officials on a single day, which were in turn documented in two memoranda that, together, constituted a mere three sentences").

Houston facility where they worked (as well as at several other BMC facilities), and were often

shipped on physical media including CD-ROMs, packaged with user manuals.  *See* Complaint

(including attached photos); A.R. 53; S.A.R. 33-36, 52-61; C.S.A.R. 135, 149, 155, 157, 453, 711.

The Workers' employment at BMC was terminated in early August 2003, as part of a round

of lay-offs in response to the company's lackluster performance in the first quarter of its 2004 fiscal

year.  Those lay-offs were reported in an article published in the *Houston Chronicle*:

> BMC Software . . . reported a first-quarter loss and said it will slash about 900 jobs
> worldwide to return to profitability.
>
> The cuts come amid a weak spending environment for technology and amount to
> about 13 percent of the Houston-based company's work force of 6,825.
>
> The maker of software for managing and monitoring large computer networks would
> not say how many of its 1,800 workers in Houston would be affected by the
> reductions, but it is closing facilities and consolidating offices across the globe in an
> effort to shave $25 million to $30 million off expenses by the fourth quarter.
>
> . . . .
>
> The company will spend $60 million this year to restructure.  Jobs in sales, research
> and development, information technology, and administration will be shed.
>
> *The company will offset some of the cuts by adding research and development jobs
> and positions in information technology to offshore facilities in India and Israel*,
> making the net reduction more like 8 percent when all is done.
>
> . . . .
>
> *The company's job cuts come on top of 230 earlier this year* that were made as part
> of a plan to discontinue a product line and reduce positions that didn't relate to high-
> priority projects.

"Weak Quarter Leads BMC to Cut 900 Jobs," *Houston Chronicle*, July 29, 2003, at 1 (emphases

added) (included at A.R. 5-7; S.A.R. 63-64).[11]

_____

[11]The *Houston Chronicle* article refers to the termination of 230 BMC employees earlier in 2003. A.R. 6; *see also* "BMC Software Lays Off 230, Including 104 in Houston," *Houston Chronicle*, March 1, 2003, at 2. It appears that those employees laid off in Spring 2003 filed their own TAA petition with the Labor Department. *See* A.R. 34-35 (notes of agency investigation in this case, referring to TAA petition TA-W-52,806); *see also* 68 Fed. Reg. 58,717 (Oct. 10, 2003) (notice of receipt and notice of initiation of investigation of TAA petition TA-W-52,806).

Of course, the administrative record filed in this case gives no indication as to the nature and extent of that earlier agency investigation. Presumably it was as *pro forma* as the investigation at issue in this action. In any event, the Labor Department denied that petition as well, less than two months before the Workers here filed their TAA petition. That denial was never appealed. *See* 68 Fed. Reg. 62,831, 62,832 (Nov. 6, 2003) (denying petition TA-W-52,806 on the grounds that "[t]he workers firm does not produce an article" – the same grounds on which the Labor Department denied the petition at issue here).

The Labor Department's certification in this case puts that earlier denial in sharp relief, and raises some troubling questions. At a minimum, the record compiled in this action demonstrates clearly that the agency's denial of the earlier petition was in error – for, as the Labor Department here ultimately found, BMC is indeed engaged in "production" of an "article," even under the relatively
narrow definition of that concept that the agency was then applying. *See generally* n.27 (discussing Labor Department's recent change of position on the treatment of software and similar "intangible" goods for purposes of TAA).

Moreover, it is easy to imagine that – had the Workers here known of the Labor Department's denial of the earlier petition filed by their coworkers – they might not have filed their own TAA petition (which would, in turn, have compounded the effect of the agency's error). *See generally* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 801 (noting that result of problems in Labor Department's administration of TAA program may be "an effective absence of due process altogether, as thousands of eligible workers may not even bother applying").

In any event, the Workers' success in this forum now ensures that the 104 Houston-based BMC employees terminated earlier in 2003, among others, are eligible for TAA benefits. But if the Labor Department had properly investigated TAA petition TA-W-52,806 and certified those 104 employees within the statutorily-mandated 40 days after the filing of their petition, they would have been eligible to receive benefits *as early as late September 2003* – and the Workers here (who would have been covered by such a certification) would have been eligible to receive TAA benefits promptly following their termination, and would never have had to file the petition at issue here, or to pursue the Labor Department's denial of that petition into court.

A copy of the *Houston Chronicle* article was included with the petition for TAA benefits that

the Workers filed with the Labor Department in late December 2003. The petition alleged, *inter*

*alia*, that the company was shifting jobs "offshore to India and Israel." A.R. 2-3, 5-7, 33. Appended

to the Workers' petition were some 25 pages of announcements of job vacancies – primarily at BMC

facilities in India and Israel – printed out from the company's website. A.R. 8-33.

In mid-January 2004, the Labor Department contacted BMC management concerning the

Workers' TAA petition. Asked to "[b]riefly describe the business activities of BMC Software, Inc.,"

the company's Senior Manager for Human Resources responded by parroting – *verbatim* – a

marketing pitch on BMC's website:[12]

> BMC Software, Inc. (NYSE: BMC), is a leading provider of enterprise management
> software solutions that empower companies to manage their IT infrastructure from
> a business perspective. Delivering Business Service Management, BMC Software
> solutions span enterprise systems, applications, databases and service management.

C.A.R. 36.[13]

---

As section II.D (below) explains, the delays in TAA certification that result from agency errors and failures like those in these two BMC cases can take a very real human toll.

[12]The administrative record filed with the Court does not include a blank questionnaire, or a memo or letter of any sort from the Labor Department forwarding questions to BMC for the company to answer, or any other evidence of the Labor Department's initial investigation – except for BMC's *response* (C.A.R. 36-37) to questions somehow communicated to the company by the agency. Indeed, the administrative record includes no documentation whatsoever of the agency's initial contacts with BMC. *See generally* n.30, *infra*.

[13]Although the Government has included BMC's response to the Government's inquiry in the Confidential Administrative Record, there is nothing remotely confidential about the "blurb" that the BMC official provided to the Labor Department. *See*, *e.g.*, BMC website (www.bmc.com), at "Corporate Profile," at "Investors," and at "BMC Software Corporation Information Statement" (where BMC "strongly encourages" the use of the quoted language "in all advertising, marketing, technical, press-statements, Web-based and other materials . . . to describe the business of BMC Software").

The Labor Department also asked BMC to advise whether the company's Houston

employees "produce an article of any kind or . . . were engaged in employment related to the

production of an article."  There too the Senior Manager for Human Resources failed to respond

directly to the Labor Department's inquiry, and instead proffered a "soundbite" plucked from the

company's promotional materials:

> BMC Software develops software solutions to proactively manage and monitor the
> most complex IT environments, enabling around-the-clock availability of business-
> critical applications.  BMC also provides services to support its software products,
> including support and implementation services.

C.A.R. 36-37.[14]

With no further inquiry, the Labor Department denied the Workers' TAA petition on January

20, 2004 – although the Federal Register notice of the *initiation* of the investigation wasn't

published till three weeks thereafter.  *Compare* A.R. 44-45 (Negative Determination Regarding

Eligibility to Apply for Worker Adjustment Assistance, dated Jan. 20, 2004) *with* 69 Fed. Reg.

6694, 6695 (Feb. 11, 2004) (notice of receipt of petition and initiation of investigation).  In effect,

the agency's Federal Register notice of the initiation of the investigation invited the Workers to seek

a hearing on a petition that the agency had already denied.

The Labor Department's official Negative Determination Regarding Eligibility to Apply for

_____

Indeed, the quoted language is included in the very news release that BMC issued to announce the "workforce reductions" that resulted in the Workers' terminations at issue here. *See* "BMC Software Reports First Quarter Results – Takes Action to Improve Profitability" (July 28, 2003) (news release).

[14]*See*, *e.g.*, BMC website (www.bmc.com), at "Press Releases" (including April 10, 2001 news release, "Brocade and BMC Software Expand Partnership to Deliver Application-Driven Storage Management for Brocade-Based SANs").

Worker Adjustment Assistance ruled that the Workers "develop[ed] software solutions," and thus "[did] not produce an article" within the meaning of the TAA statute. A.R. 44-45.[15] *See also* 69 Fed. Reg. at 11,888 (ruling that "[t]he workers firm does not produce an article as required for certification [under the TAA statute]").[16]

According to an undated internal agency memorandum documenting the "Findings of the Investigation," the Labor Department concluded – solely on the strength of the information supplied by BMC's Senior Manager for Human Resources – that the Workers were "engaged in the development of" software, and thus "provide[d] development services." To support the agency's conclusion that "[BMC] [w]orkers do not produce an article," the agency memorandum erroneously attributed a statement to that effect to BMC's Senior Manager for Human Resources. *See* C.A.R.

---

[15]The Negative Determination similarly concluded that the Workers were ineligible for certification as service workers. According to that ruling:

> Workers . . . may be certified [as service workers] only if their separation was caused importantly by a reduced demand for their services from a parent firm, a firm otherwise related to their firm by ownership, or a firm related by control. Additionally, the reduction in demand for services must originate at a production facility whose workers independently meet the statutory criteria for certification, and the reduction must directly relate to the product impacted by imports. These conditions have not been met for workers at this firm.

A.R. 44-45. *See also* n.21, *infra*.

[16]It is unclear why Federal Register publication of the notice of the denial of the Workers' petition was delayed until March 11, 2004, when the petition had been denied almost seven weeks earlier (on January 20, 2004). *Compare* A.R. 44-45 (Negative Determination Regarding Eligibility to Apply for Worker Adjustment Assistance, dated Jan. 20, 2004) *with* 69 Fed. Reg. 11,887, 11,888 (March 12, 2004) (notice of denial of petition). Indeed, the official notice of the denial of the Workers' petition was not published in the Federal Register until more than a month after the Workers filed their request for reconsideration of that ruling. *See* A.R. 53 (Workers' request for reconsideration of denial of petition, dated Feb. 9, 2004).

42.[17]  The memorandum also stated that BMC's "Standard Industrial Classification" ("SIC") code

is 7371 (the code for "Computer Programming Services"), although the source of that information

was not specified, and the relevance and accuracy of the information are dubious at best.  *Id*.[18]

Copies of the Labor Department's Negative Determination were sent to the Workers under

cover of a standard form letter which advised them of their right to seek administrative

---

[17]Contrary to the representation in the internal agency memorandum, BMC's Senior Manager for Human Resources in fact *had not* stated that the company does not produce a product.  *Compare* C.A.R. 42 (undated internal agency memorandum) *with* C.A.R. 36-37 (BMC's responses to agency questions in course of initial investigation).

As discussed above, in response to the Labor Department's query whether the company produced a product, BMC's Senior Manager for Human Resources stated:

> BMC Software develops software solutions to proactively manage and monitor the most complex IT environments, enabling around-the-clock availability of business-critical applications.  BMC also provides *services* to support its software *products*, including support and implementation *services*.

C.A.R. 36-37 (emphases added).  That response cannot fairly be read as a statement that BMC does not produce a product.  To the contrary, as discussed in section II.A below, the response itself expressly refers to BMC "products" (and, indeed, also refers – in contrast – to the company's provision of "services" as well, implicitly distinguishing the two).

[18]*See generally* section II.C & n.54, *infra* (explaining, *inter alia*, that other sources identify BMC's SIC code as 7372).  *See also* Former Employees of Murray Engineering, Inc. v. Chao, 28 CIT ____, ____, ____, 346 F. Supp. 2d 1279, 1284, 1289 (2004) ("Murray Engineering I") (criticizing agency's reliance on former employer's NAICS code in TAA investigation); Murray Engineering II, 28 CIT at ____ n.8, 358 F. Supp. 2d 1273 n.8 (same); Merrill Corp. II, 29 CIT at ____, 387 F. Supp. 2d at 1345.  *Cf*. IBM I, 29 CIT at ____, 387 F. Supp. 2d at 1348-49.

As the Labor Department's website explains, the Standard Industrial Classification ("SIC") system historically has been used by that agency and other parts of the federal government to classify businesses by the industry in which they are engaged, for statistical and other purposes.  According to the website, the North American Industry Classification System ("NAICS") replaces the SIC system.  For additional information, including a copy of the Standard Industrial Classification Manual, see the Labor Department's website.

reconsideration by the agency.  Incredibly, however, the Labor Department's letter said nothing

about the Workers' right to challenge the Negative Determination in this court.  *See* A.R. 46-49.[19]

The Workers timely sought reconsideration of the denial.  In their request for

reconsideration, the Workers emphasized that the Labor Department's Negative Determination

erroneously stated that the *investigation* was *initiated* on October 9, 2003 – a date that was actually

several months before the *petition* was even *filed*.  The Workers disputed the Labor Department's

determination that BMC did not produce an article, and referred the agency to three specific

locations on BMC's website, including "an online store for purchasing BMC *products* and *product*

*lines*."  A.R. 53 (emphases added).  The Workers quoted the BMC website:

> Now you're ready to shop online with BMC Software.  Browse through the store by
> category or by the A-Z list below.  If you know the name of your *product*, use the
> *Product* Name Search field to locate your product quickly.

*Id*. (emphases added).  The Workers explained that "[t]he use of the term 'solutions' is misleading.

Usage of the term 'solutions' within the BMC Software, Inc. web page and other places is

synonymous with 'product lines.'" And the Workers again stated that BMC was shifting work "to

overseas companies as well as newly created BMC locations overseas."  The Workers added that

software was also being "imported to make up the products and product lines that BMC Software,

Inc. produces."  A.R. 53.

In response to the Workers' request for reconsideration, a Labor Department staffer called

BMC's Senior Manager for Human Resources (the same company official who had responded to

---

[19]*See also* <u>IBM</u>, 29 CIT at ____, 403 F. Supp. 2d at 1321 (criticizing Labor Department's "fail[ure] to advise the Former Employees [of IBM] of the option of seeking judicial review instead" of seeking administrative reconsideration of denial of TAA certification).

the agency's initial request for information). The BMC official reportedly stated flatly that "no products are manufactured" by the company, and that the company's software is not "recorded on media disks," nor is it "mass-produced" or "sold off-the-shelf." She further stated that "most [of BMC's] software is customized for individual users," and denied that jobs had been transferred abroad. C.A.R. 55.

The agency staffer apparently failed to ask any follow-up questions concerning, for example, the nature and volume of BMC software that is *not* "customized for individual users." Similarly, the staffer failed to explore with the BMC official the allegations of increased imports raised in the Workers' request for reconsideration. Indeed, the agency staffer did nothing to confront the BMC official with any of the information provided by the Workers. Nor did the staffer make any other effort to reconcile the evident discrepancies and inconsistencies in the information before the agency.

Based on nothing more than its phone conversation with BMC's Senior Manager for Human Resources, the Labor Department denied the Workers' request for reconsideration, ruling once again that they were "not considered to have been engaged in production."[20] 69 Fed. Reg. at 20,642.[21]

---

[20]The Labor Department's notice denying the Workers' request for reconsideration further stated: "The petitioner also alleges that imports impacted layoffs, asserting that because workers lost their jobs due to a transfer of job functions overseas, petitioning workers should be considered import impacted." 69 Fed. Reg. at 20,642.

There are, however, at least two problems with that statement. First, as discussed immediately above, the Labor Department investigator reviewing the request for reconsideration failed to ask BMC about the Workers' claims of increased imports. *See* C.A.R. 55. There is therefore nothing in the record on the request for reconsideration to support an agency finding on increased imports. And, second, the quoted statement improperly conflates two separate bases for TAA certification – increased imports *versus* a shift in production – and is simply illogical. *Compare* 19 U.S.C. § 2272(a)(2)(A) (Supp. II 2002) (increased imports) *and* 19 U.S.C. §

2272(a)(2)(B) (Supp. II 2002) (shift in production) (both quoted in n.6, *supra*).

[21]Similarly, the notice denying the request for consideration reiterated the agency's prior ruling that the Workers also could not be certified as "service workers" – albeit based on a rather different rationale:

> Only in very limited instances are service workers certified for TAA, namely the worker separations must be caused by a reduced demand for their services from a parent or controlling firm or subdivision whose workers produce an article and *who are currently under certification for TAA*. The investigation revealed no such affiliations.

69 Fed. Reg. at 20,642 (emphasis added).

Although the error is of no significance in this case (since the Workers here have now been certified), it is worth noting that the formulation in the Labor Department's notice denying the Workers' request for reconsideration (quoted immediately above) materially misstated the test for certification as "service workers."

In that formulation of the "service workers" test, the Labor Department would require that the separations of the petitioning workers be attributable to a reduced demand for their services by a facility "*whose workers* produce an article and . . . *are currently under certification for TAA*." *Id*. (emphasis added). In contrast, in its initial Negative Determination denying the Workers' petition, the agency accurately stated the "service workers" test – "the reduction in demand for [the petitioning workers'] services must originate at a production facility *whose workers independently meet the statutory criteria for certification*." (Emphasis added.) *See* n.15, *supra* (*quoting* Negative Determination Regarding Eligibility to Apply for Worker Adjustment Assistance, at A.R. 44-45). *See generally* Chevron I, 26 CIT at 1285, 245 F. Supp. 2d at 1328 (citations omitted) (discussing criteria for TAA certification as "service workers").

As Chevron I explained, "The question is not whether there was a certification already *in effect*. Instead, what the Labor Department must determine is whether workers at the relevant production facility met the criteria for certification – whether or not they actually sought it." *Id*., 26 CIT at 1288, 245 F. Supp. 2d at 1331 (*citing* Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 26 CIT 739, 747-48, 215 F. Supp. 2d 1345, 1355 (2002) ("Marathon Ashland I"); Champion Aviation I, 23 CIT at 354; Bennett v. U.S. Sec'y of Labor, 20 CIT 788, 792 (1996)).

The distinction between the two formulations of the "service workers" test (essentially whether the workers at the relevant production facility must already be "certified" *versus* whether they would be/would have been "certifiable") may be subtle, but it can be quite significant – particularly for the potentially large numbers of workers who qualify under the correct formulation

of the test ("certifiable"), but not the other.

In correspondence in another recent TAA case (in which the Labor Department had made the same mistake), the Court brought this issue to the attention of the Government. *See* Letter to Counsel for Defendant from the Court (April 23, 2004), *filed in* Former Employees of IBM Corp. v. U.S. Sec'y of Labor, Court No. 04-00079; *see generally* IBM, 29 CIT at ____, 403 F. Supp. 2d at 1318 (discussing Labor Department's clarification of "certified" *versus* "certifiable," in context of "service workers" test). That letter noted that initial research indicated that the Labor Department had not been consistent in its formulation of the "service workers" test. The letter continued:

> [O]ur initial research [also] has disclosed no discussion of a *legal* rationale for either "certified" or "certifiable." It is, in any event, unclear – at least at first blush – whether there could be any legitimate *policy* basis for limiting service worker coverage to those cases where the production workers are already "certified." It would, no doubt, be easier for the Labor Department to determine whether a group of production workers was already certified than it would be to determine whether they *could* be certified. But, in light of the remedial purpose of the trade adjustment assistance laws, it is unclear whether mere administrative convenience would suffice to justify limiting coverage of service workers.
>
> Moreover, it seems clear that the remedial purpose of the laws would be better served by covering service workers whenever the relevant group of production workers *could* be certified (whether they actually have been certified, or not). For example, it is possible to imagine a group of production workers displaced by imports who do not need retraining (*i.e.*, because their skill set makes them readily employable in some other, non-trade impacted industry). The service workers who formerly supported the production workers, on the other hand, may require retraining (if their skills are not readily transferable).

*Id*. at 2-3; *see generally* IBM, 29 CIT at ____, 403 F. Supp. 2d at 1318. *See also* UAW v. Marshall, 584 F.2d at 396-97 (in construing provision of TAA statute, Labor Department's "interpretation . . . is to be shaped with[] reference to the general remedial purpose" of TAA statute; agency is obligated to interpret provision so that it "best effectuates the [remedial] purposes of the [TAA statute] in light of the circumstances of the individual case").

In response to the Court's letter in IBM, the Labor Department sought a voluntary remand of that case, explaining that the test applied by the agency there (which purported to require that the relevant production facility already be "certified") "[did] not reflect Labor's current interpretation" of the TAA statute concerning certification of "service workers." *See* [Defendant's] Consent Motion for Voluntary Remand (May 14, 2004), *filed in* Former Employees of IBM Corp. v. U.S. Sec'y of Labor, Court No. 04-00079. According to the Government's motion for remand in that case:

The Labor Department summarized its rationale, emphasizing the concept of "tangibility":[22]

> *Labor's current interpretation* [*concerning certification of* "*service workers*"] *eliminates any distinction between certified and certifiable workers* and focuses directly upon whether the petitioning worker group meets the statutory test for eligibility for certification. As of April 2004, Labor will certify petitions from workers who perform services for a firm or an appropriate subdivision of such firm if the work of the petitioning workers is related to the firm's production of a "trade-impacted" article under 19 U.S.C. § 2272 and the workers otherwise satisfy [statutory] eligibility criteria.

*Id*. at 4-5 (emphasis added). *See also* "DOL Planning More In-Depth Probes of Service Workers' Eligibility for TAA," BNA Int'l Trade Reporter, June 17, 2004, at 1019 (explaining that "[u]nder the new policy, DOL will investigate whether service workers seeking TAA benefits performed work 'in support of any production' and will 'conduct further data collection in cases where related production exists'").

There is, thus, an important distinction between the criteria for certification as "service workers" and those for certification as "secondary workers." The express terms of the TAA statute require that – to be eligible for certification as "secondary workers" – "the [petitioning] workers' firm (or subdivision) . . . [must be] a supplier or downstream producer to a firm (or subdivision) that employed *a group of workers who received a certification* of eligibility" for TAA benefits. 19 U.S.C. § 2272(b)(2) (Supp. II 2002) (emphasis added).

Finally, it is also worth noting that the Labor Department recently extended its coverage of "service workers" to include certain so-called "leased workers." *See generally* <u>IBM</u>, 29 CIT at ____, ____ n.38, 403 F. Supp. 2d at 1315-18, 1336 n.38 (summarizing history of "leased workers" policy, and remanding matter to agency with instructions to, *inter alia*, publish a "public document" setting forth agency's policy); 71 Fed. Reg. 10,709, 10,712 (March 2, 2006) (Negative Determination on Remand in <u>IBM</u>, the "public document" in which Labor Department sets forth its "interim response" articulating its "leased workers" policy, and specifies "seven criteria that will be applied to determine the extent to which a worker group engaged in activities related to the production of an article by a producing firm is under the operational control of the producing firm"; asserting that agency "retains the discretion to further revise this policy, so that the subject of 'operational control' can continue to receive close scrutiny as DOL undertakes rulemaking to update the regulations").

[22]The Labor Department has advanced similar views – articulated in varying formulations – in a number of cases filed with the court in recent years involving software and similar "intangible" goods. Because BMC in fact sells its software "prepackaged" in "shrink wrap form" as well as electronically ("in object code form"), the Workers in this case qualified for TAA certification even under the criteria that the Labor Department was applying at the time. There is

therefore no need here to reach the substantive merits of those criteria, except to note that the Workers vigorously disputed them, and that the agency has since repudiated them. *See* nn.25 & 27, *infra*.

        *See generally*, *e.g.*, <u>Former Employees of Ericsson, Inc. v. U.S. Sec'y of Labor</u>, Court No. 02-00809 (petitioning workers who "designed, wrote code for, and tested software programs" ultimately certified based on Labor Department's determination that they "supported production at an affiliated software production facility"); <u>Former Employees of Murray Engineering, Inc. v. United States</u>, Court No. 03-00219 (petitioning workers who produced custom designs for industrial machinery which were embodied on physical media (CD Roms and paper) ultimately denied certification, based on Labor Department's determination that former employer had not shifted design work abroad and that there had been no increase in imports of "like or directly competitive" articles); <u>Former Employees of Electronic Data Systems Corp. v. U.S. Sec'y of Labor</u>, Court No. 03-00373 (petitioning workers who developed "financial applications software" as well as enhancements, including new code, ultimately certified based on recent change in Labor Department policy concerning definition of "article"); <u>Former Employees of Mellon Bank, N.A. v. U.S. Sec'y of Labor</u>, Court No. 03-00374 (petitioning workers who "designed and developed computer software applications . . . to provide financial services to [bank] customers" ultimately denied certification, based on Labor Department's (now repudiated) rationale that "informational products that could historically be sent in letter form and that can currently be electronically transmitted" are not "articles" for purposes of TAA, and the "the design and development of . . . software itself" does not constitute "production"); <u>Former Employees of Sun Apparel of Texas v. U.S. Sec'y of Labor</u>, Court No. 03-00625 (petitioning garment workers ultimately denied certification based on Labor Department's determination that "patterns and markers" produced by workers "were created by using special computer programs," "were neither stored nor transmitted in a physical medium, but existed in an electronic form (such as a file on a computer server or an electronic mail)," "were electronically manipulated," and "were sent exclusively via electronic mail"); <u>Former Employees of IBM Corp., Global Services Division v. U.S. Sec'y of Labor</u>, Court No. 03-00656 (petitioning "software developers who write and test computer software" ultimately certified based on recent change in Labor Department policy concerning definition of "article"); <u>Former Employees of Merrill Corp. v. United States</u>, Court No. 03-00662 (in light of recent change in Labor Department policy concerning definition of "article," action presently on remand to agency for reconsideration of agency's prior denial of certification of workers who "created electronic documents for printing and filing with the Securities and Exchange Commission," where denial was based on, *inter alia*, agency's (now disavowed) reasoning that "electronic creations are not 'articles' for the purposes of the Trade Act unless they are embodied in a physical medium"; remand results due to be filed Aug. 31, 2006); <u>Former Employees of Computer Sciences Corp. v. U.S. Sec'y of Labor</u>, Court No. 04-00149 (petitioning workers who produced "financial software" ultimately certified based on recent change in Labor Department policy concerning definition of "article"); <u>Former Employees of Gale Group, Inc. v. U.S. Sec'y of Labor</u>, Court No. 04-00374 (petitioning workers who "created electronic documents and performed electronic indexing services and occasionally wrote abstracts

Software design and developing are not considered production of an article within the meaning of [the TAA statute]. Petitioning workers do not produce an "article" within the meaning of [that statute]. Formatted electronic software and codes are not *tangible* commodities, that is, marketable products, and they are not listed on the Harmonized Tariff Schedule of the United States (HTS), . . . which describes articles imported to the United States.

To be listed in the HTS, an article would be subject to a duty on the tariff schedule and have a value that makes it marketable, fungible and interchangeable for commercial purposes. Although a wide variety of *tangible* products are described as articles and characterized as dutiable in the HTS, informational products that could historically be sent in letter form and that can currently be electronically transmitted . . . are not listed in the HTS. Such products are not the type of products that customs officials inspect and that the TAA program was generally designed to address.

*Id.* (emphases added).[23]

This action ensued. In lieu of filing an Answer with the court, the Government sought and was granted a voluntary remand to conduct a further investigation and to make a redetermination as to the Workers' eligibility for TAA benefits.[24]

of articles" ultimately certified based on recent change in Labor Department policy concerning definition of "article"); Former Employees of Lands' End Business Outfitters v. U.S. Sec'y of Labor, Court No. 05-00517 (petitioning workers who "create[d] digitized embroidery designs from customers' logos" ultimately certified based on recent change in Labor Department policy concerning definition of "article").

[23]The administrative record filed with the Court in this case includes letters transmitting the notice of the denial of the request for reconsideration to only two of the four Workers who signed the petition. *See* A.R. 60-61. It is unclear whether the Labor Department failed to send such letters to the other two Workers, or whether it sent them but failed to include them in the administrative record.

[24]As grounds for the voluntary remand, the Government cited the Labor Department's "need[] to resolve an apparent conflict between information provided by company officials and information provided by the petitioners" (specifically, whether BMC produces "products"). However, as counsel for the Government candidly conceded, the "conflict" between information

On remand, the Labor Department reiterated – and elaborated on – its test for "production"

of an "article" in the context of the software industry, further emphasizing the characteristic of

"tangibility":

> The Department has consistently maintained that the design and development of
> software is a service. In order to be treated as an article, for TAA purposes, a
> software product must be *tangible*, fungible, and widely marketed. The Department
> considers software that is mass-replicated on physical media (such as CDs, tapes, or
> diskettes) and widely marketed and commercially available (*e.g.*, packaged "off-the-
> shelf" programs) and dutiable under the Harmonized Tariff Schedule of the United
> States to be an article. The workers designing and developing such products would
> be considered to be engaged in services supporting the production of an article.

69 Fed. Reg. at 76,783 (emphasis added).[25]  Applying that analysis in the course of its remand

investigation here, the Labor Department "raised additional questions and obtained detailed

supplemental responses from the company." *Id*.

The information provided by BMC in the course of the remand proceedings conflicted with

---

provided by the petitioners and that provided by BMC was "apparent" during the course of the
Labor Department's investigation – long before the Workers filed their Complaint with the Court.
*See* [Defendant's] Second Amended Motion for Voluntary Remand (July 6, 2004), at 3 (relying in
part on information provided with Worker's "request for administrative reconsideration"). *Cf.* Letter
from the Court to Defendant (March 19, 2004), *filed in* Former Employees of Paradise Fisheries v.
United States, Court No. 03-00758 (rejecting Labor Department's claim that TAA certification was
based on "new information" supplied to agency after Complaint was filed; "While it may be true that
the Labor Department had previously *failed* to make the connection, it cannot honestly be said that
the agency was '*unable*' to make the connection before the Complaint was filed.").

[25]Again, as explained in note 22 above, there is no need here to reach the substantive merits
of the criteria for TAA certification of software workers that the Labor Department applied in this
case. But the Workers took strong exception to those criteria. In a letter to the Labor Department,
counsel for the Workers took pains to emphasize that, although they were providing the agency with
information to demonstrate that the Workers fulfilled the criteria articulated by the agency,
"[n]othing . . . [in the Workers' communications] should be construed as acquiescence to the
Department of Labor's view that a *physical* product *listed in the Harmonized Tariff Schedule* must
have been produced . . . in order for the[ ] former employees to be entitled to benefits under the
TAA." S.A.R. 34 (emphases added).

the information that the company had supplied earlier, and bore out the Workers' claims, casting an

entirely new light on the merits of the Workers' TAA petition. Reiterating its position that "to be

treated as an article . . . for TAA purposes, a software product must be *tangible*," the Labor

Department explained:

> [T]he new information showed that, in addition to software design and development,
> the firm does, in fact, mass-replicate software at the subject facility. Further,
> software produced by the firm at the subject facility includes not only custom
> applications, but [also] packaged 'off-the-shelf' applications which are mass-
> replicated *on various media* (*CDs and tapes*) at the subject facility.

69 Fed. Reg. at 76,783 (emphases added). Noting that BMC employees "are not separately

identifiable by product line," the Labor Department concluded that the Workers here were, indeed,

"engage[d] in activity related to the production of an article." *Id*.

On remand, the Labor Department also re-evaluated the Workers' allegations that BMC had

shifted production overseas, to India and Israel. 69 Fed. Reg. at 76,783. The agency concluded that

"there was no shift in production, for TAA purposes." *Id*. However, the agency did find that

"employment and production of packaged, mass-replicated software at the subject facility had

declined significantly from 2002 to 2003," that "company imports of mass-replicated software

increased during the same period," and that "the increase in company imports represented a

significant percentage of the decline in production at the subject facility during the relevant period."

*Id*.[26]

---

[26]As explained in greater detail above (and in notes 20 and 35), the Workers' request for reconsideration alleged an increase in imports of BMC products and product components. However, the Labor Department made no effort to investigate that allegation until after this action was filed. *Compare* A.R. 53 *with* C.A.R. 55 *and* A.R. 56-59. *Cf*. Sun Apparel I, 28 CIT at ____, 2004 WL 1875062 at * 2 (although "the record . . . contained no evidence to support its findings, Labor nevertheless determined that [the subject company] did not increase its imports").

The Labor Department therefore determined on remand "that increases of imports of articles like or directly competitive with those produced at BMC Software, Inc., Houston, Texas, contributed importantly to the total or partial separation of a significant number of workers and to the decline in sales or production at that firm."  Accordingly, nearly one full year after the TAA petition was filed (and more than 16 months after the Workers here lost their jobs), the Labor Department certified as eligible to apply for benefits all Houston-based BMC employees "who became totally or partially separated from employment on or after December 23, 2002, through two years from the issuance of [the] revised determination."  69 Fed. Reg. at 76,783-84.

Moreover, the Labor Department has recently revised its position to recognize that – at least for purposes of cases such as this – "there are tangible and *intangible* articles," and that "the production of intangible articles can be distinguished from the provision of services." *See*, *e.g.*, Computer Sciences Corporation: Notice of Revised Determination on Remand, 71 Fed. Reg. 18,355 (April 11, 2006) (emphasis added).  Accordingly, "[s]oftware and similar *intangible* goods that would have been considered articles for the purposes of the Trade Act if embodied in a physical medium will now be considered to be articles regardless of their method of transfer."  *Id*. (emphasis added).  In short, as the Labor Department apparently now concedes, the Workers here would have been entitled to TAA certification even if BMC's software had not been "replicated on various media (CDs and tapes)" – that is, even if it had not been in "tangible" form.[27]

_____

[27]The Labor Department's revised policy is the culmination of a large body of caselaw roundly criticizing the bankrupt logic of the agency's longstanding position on the treatment of software and similar "intangible" goods for purposes of TAA.  *See generally* n.22, *supra*.  In truth, the agency's new position is not a new "policy" at all.  Nor is it based on some new interpretation of law.  In reality, the Labor Department's recent change of position reflects nothing more than the agency's belated acknowledgment and correction of certain fundamental mistakes of fact on which

## II. <u>Analysis</u>

To be sure, the Workers are gratified by the Labor Department's affirmative determination granting their TAA petition. But they are also quite understandably bewildered that it took the agency so long to grant them the relief to which they are entitled. And they are frustrated that they had to haul the Labor Department into court to force the agency to take a hard look at their claim. Moreover, while the Government is to be commended for recognizing the need for a voluntary remand, the Labor Department's "about-face" as a result of that remand simply underscores the fact that the agency should have certified these Workers in the first place, within 40 days of receipt of

_____

its longstanding position on "[s]oftware and similar intangible goods" was premised – mistakes to which the agency had repeatedly turned a blind eye and deaf ear.

Already the Labor Department's revised position has resulted in the agency's certification of a number of groups of workers whose TAA claims had been repeatedly denied, and who had sought recourse in the court. *See*, *e.g.*, Computer Sciences Corporation: Notice of Revised Determination on Remand, 71 Fed. Reg. 18,355 (April 11, 2006); Electronic Data Systems Corporation: Notice of Revised Determination on Remand, 71 Fed. Reg. 18,355 (April 11, 2006); Lands' End: Notice of Revised Determination on Remand, 71 Fed. Reg. 18, 357 (April 11, 2006); IBM Corporation: Notice of Revised Determination on Remand, 71 Fed. Reg. 29,183 (May 19, 2006); Gale Group, Inc.: Notice of Revised Determination on Remand, 71 Fed. Reg. 43,213 (July 31, 2006).

The full extent of the damage attributable to the Labor Department's protracted adherence to its indefensible position is incalculable. To begin with, it in unclear whether the outcomes of any other TAA cases filed with the court in recent years would have differed had the Labor Department acknowledged and corrected its mistakes at an earlier date. *But see* n.79, *infra*. But, at a minimum, it seems highly likely that, in recent years, the Labor Department has denied TAA petitions from workers in the software industry that the agency would now agree should have been granted, and which were never appealed in court. And it is a virtual certainty that there are workers in the software industry who would have filed TAA petitions with the Labor Department, but were deterred by the agency's longstanding – and now repudiated – position. *See generally* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 801 (noting that result of problems in agency's administration of TAA program may be "an effective absence of due process altogether, as thousands of eligible workers may not even bother applying").

their petition.

In this case, like so many others in recent years, the agency's "investigation" was "a shockingly cursory process."[28] In short, as discussed more fully below, it exalts form over substance to characterize as an "investigation" the Labor Department's superficial review of the Workers' petition at the agency level.[29]

_____

[28]*See* Harper's Magazine at 63 (explaining that, after a TAA petition is filed, the Labor Department "initiates an investigation, which involves faxing the company a few generic forms and sometimes making a follow-up phone call or two . . . . It is a shockingly cursory process").

[29]An "investigation" is defined as a "detailed examination" or "a searching inquiry," "an official probe." Webster's Third New International Dictionary (Unabridged) 1189 (2002). The Labor Department's track record in TAA cases in this court belies any suggestion that the agency's typical initial review of a TAA petition can fairly be described as an "investigation." Indeed, one senior government lawyer familiar with the Labor Department's process has implicitly conceded as much:

> [A]lthough Congress has mandated that Labor conduct an "investigation," *with all the active and exhaustive connotations which that term might imply*, the reality is that Congress also has appropriated a finite amount of resources for the conduct of these investigations.

McCarthy at 14 (emphasis added). *See generally* 19 U.S.C. § 2271(a) (requiring Labor Department to give notice that agency "investigation" has been initiated).

The bottom line, however, is that Congress has mandated that the Labor Department "investigate" workers' TAA claims – *not* that those claims be, for example, merely "considered," or "evaluated," or "reviewed." *See* Shoshone Indian Tribe v. United States, 364 F.3d 1339, 1347 (Fed. Cir. 2004) (and cases cited there) (In statute of limitations provision, "Congress's choice of the phrase 'shall not commence to run' instead of 'tolls' should be given effect. There exists a strong presumption that 'Congress expresses its intent through the language it chooses' and that the choice of words in a statute is therefore deliberate and reflective."). Moreover:

> [I]f the [Labor Department's] resources are not adequate to enable it to meet its statutory mandate, the remedy lies with Congress. The volume of claims filed with the agency cannot serve to excuse it from fulfilling its legal obligations *vis-a-vis* the legions of displaced workers. Indeed, if anything, the volume of claims filed serves to underscore the vital nature of the agency's mission.

A.  The Labor Department's Failure to Identify and Resolve
Discrepancies and Inconsistencies in Information Provided to It

The entirety of the Labor Department's initial investigation here consisted of a mere five

questions (all of which were either very basic, or conclusory, or both), posed to BMC's Senior

Manager for Human Resources.  C.A.R. 36-37.[30]  The record reveals that the agency made no effort

Ameriphone, 27 CIT at ____, 288 F. Supp. 2d at 1360.

[30]As note 12 explains, the Labor Department omitted from the administrative record all documentation of its initial contact with BMC.

The agency's Petition Log Sheet (A.R. 1) indicates that BMC was contacted on January 12, 2004.  But the administrative record includes no documentation of that contact.  There are no notes of the Labor Department's initial telephone call(s) or e-mail message(s) to BMC – no indication as to which agency staffer contacted BMC, no indication as to which BMC official(s) were contacted, no indication as to the mode of communication, and no indication as to the substance of that communication.  The Petition Log Sheet also indicates that the agency issued a data request to BMC that same day.  *See* A.R. 1.  But that data request, too, is missing from the administrative record.  Nor does the record include a copy of any Labor Department letter or memo to BMC communicating its questions to the company.  It is thus impossible to discern from the record whether the agency forwarded to BMC the standard Business Confidential Data Request questionnaire that the agency has typically used in TAA cases.

The sole evidence of the Labor Department's contact with BMC in the course of the initial investigation is BMC's *response* to the agency's inquiries, which consists of the company's answers to a mere five questions:

(1) What is the full legal name and address of your firm?
(2) Is your firm affiliated with another company?  If so, name the affiliated company (including address) and describe the affiliation.
(3) Briefly describe the business activities of BMC Software, Inc., Houston, TX (TA-W-53,918).
(4) Do the workers in BMC Software, Inc., Houston, TX (TA-W-53,918) of your firm produce an article of any kind or were they engaged in employment related to the production of an article?  If workers do produce an article, please explain, and what is the product?
(5) Briefly explain the circumstances relating to separations at your firm that have taken place in the last year.

whatsoever to follow up with company officials (via telephone or otherwise) – even though the company's responses to the Labor Department's few substantive questions were non-responsive, ambiguous, and/or inconsistent with other information on the record, and thus begged for clarification.

For example, as discussed in section I.B above, BMC's Senior Manager for Human Resources supplied "canned" marketing pitches in response to both the Labor Department's request for a description of the company's business, and the agency's inquiry as to whether BMC workers "produce an article." It would be, frankly, impossible for anyone – including the Labor Department – to discern from BMC's non-responsive answers whether or not the company's software constitutes a "product" within the Labor Department's interpretation of the TAA laws at that time (that is, whether BMC's software is mass-replicated on physical media (such as CDs, tapes, or diskettes) and is widely marketed and commercially available (*e.g.*, packaged for "off-the-shelf" sale)). Nevertheless, the Labor Department failed to seek any clarification – from either BMC or the Workers.

_____

C.A.R. 36-37. The Labor Department's questions were simply much too vague and generalized, and were not reasonably calculated to elicit the necessary information – at least not without agency follow-up.

For example, although the Labor Department knew from the name of the corporation (as well as the Workers' TAA petition form) that BMC is a software company, the agency failed to inquire whether BMC's software is "tangible, fungible, and widely marketed," or whether it is "mass-replicated on physical media (such as CDs, tapes, or diskettes) and widely marketed and commercially available (*e.g.*, packaged 'off-the-shelf programs')" – the very criteria that the Labor Department at the time professed to "consistently" apply in cases such as this. *See* 69 Fed. Reg. at 76,783. Similarly, the agency's broad request for a brief explanation of "the circumstances relating to separations" at BMC was no substitute for specific questions about factors such as increased imports and shifts in production abroad.

Indeed, in responding to the Labor Department's query whether the company's workers "produce an article," BMC's Senior Manager for Human Resources herself actually used the term "products" – *i.e.*, "software *products*" – in describing BMC's business. *See* C.A.R. 37 (emphasis added). Yet, not only did the Labor Department fail to seek clarification of that ambiguous reference, but the agency investigator even purported to rely on the company official's statement as the sole basis for the agency's affirmative conclusion that BMC employees *do not* produce a "product":

> According to company official, [the Senior Manager for Human Resources], the workers at BMC . . . *did not* produce a *product*.

*Compare* C.A.R. 42-43 (undated internal agency memorandum) (emphases added) *with* C.A.R. 36-37 (BMC's responses to agency questions in course of initial investigation). The Labor Department investigator thus impermissibly distorted what little information was supplied by the company in response to the agency's inquiries.[31]

Similarly, the Labor Department made no attempt to reconcile the discrepancy between

---

[31]Regrettably, this is no isolated incident. The Labor Department has been criticized for distorting and misrepresenting evidence in other cases as well. *See generally* IBM, 29 CIT at ____ & n.34, 403 F. Supp. 2d at 1334-35 & n.34 (Labor Department's determination "spins" information, with effect of "obscur[ing]" its true significance); Former Employees of Federated Merch. Group v. United States, 29 CIT ____, ____, 2005 WL 290015 at * 5 (2005) (agency "mischaracteriz[ed]" e-mail exchange in which company official explained reason for workers' separation, resulting in improperly "truncated" investigation); Sun Apparel I, 28 CIT at ____, 2004 WL 1875062 at ** 4, 8 (where employer stated only that patterns and markers were "shipped primarily" by electronic means, agency erred by ignoring employer's limiting use of "primarily" and instead drawing "the much broader conclusion that [*all*] the patterns and markers were generated and shipped electronically" and, on that basis, concluding that no "production" occurred); Former Employees of Pittsburgh Logistics Sys., Inc. v. U.S. Sec'y of Labor, 27 CIT ____, ____, ____ n.9, 2003 WL 22020510 at ** 9, 13 n.9 (2003) ("Pittsburgh Logistics II") (in one instance, Labor Department "egregiously" quoted contract provision "out of context"; more generally, court took agency to task for repeated use of "out-of-context quotations").

information supplied by the Workers in their TAA petition and the agency's conclusion that "the workers at BMC . . . did not produce a product." For example, near the top of a number of the pages of job vacancy announcements printed out from BMC's website (and appended to the Workers' TAA petition) is a banner consisting of six buttons, labeled "Home," "Partners," "Support," "Store," "Education," and – significantly – "*Products* & Solutions." *See*, *e.g.*, A.R. 12, 17, 21, 26, 31 (emphasis added). And the job vacancy announcements themselves included listings not only for positions such as "Systems Programmers" and "Programmer Analysts," but also for positions such as "*Product* Developers" and "Sr. *Product* Developers." *See*, *e.g.*, A.R. 8-9, 11-14, 19, 22, 24-25, 27-30 (emphases added).

To be sure, an employer's use of the term "product" is by no means conclusive, or binding on the Labor Department. But it is equally clear that such a use warrants further inquiry by the agency, and that – absent such further inquiry, accompanied by a reasoned explanation of the facts (reconciling the company's use of the term) – the agency is not free to conclude (as it did here) that petitioning workers do not produce a product.

The Labor Department further failed even to acknowledge – much less seek to resolve – apparent inconsistencies between other information provided by the Workers in their TAA petition and that supplied by their former employer, BMC. For example, asked by the Labor Department to "[b]riefly explain the circumstances relating to separations at [BMC]," the company's Senior Manager for Human Resources responded simply that the company had taken "significant restructuring actions, including reductions in force, to reduce its ongoing operational expenses to be in line with the revenue that [was then] currently being generated." C.A.R. 37. The Labor Department made no effort whatsoever to plumb the meaning of that wholly uninformative response.

Certainly the agency made no effort to press BMC on the underlying causes of the layoffs,[32] or the specifics of BMC jobs being moved overseas. Yet the *Houston Chronicle* article appended to the Workers' TAA petition reported that, while BMC jobs in Houston and elsewhere were being slashed, the company planned to "offset some of the cuts" by adding positions "to offshore facilities in India and Israel." A.R. 5-6. And the vast majority of the listings in the 25 pages of BMC job vacancy announcements included with the Workers' TAA petition were for positions in India and Israel. *See* A.R. 8-32. That and other critical information was either overlooked or simply ignored in the Labor Department's preparation of its "Findings of the Investigation" and in its initial negative determination. C.A.R. 42-43; A.R. 44-45.

Adding insult to injury, the agency's investigation conducted in response to the Workers' request for reconsideration was little more than a rubber-stamp of its initial denial. The Labor Department's reconsideration consisted – in toto – of a single phone conversation with BMC's Senior Manager for Human Resources (the same company official who had responded to the agency's initial questions). That conversation was in turn documented by the agency investigator

---

[32]BMC's response to the Labor Department's question (quoted above) was little more than a tautology, not illuminating in the least. *See* C.A.R. 37. In essence, BMC responded that the company laid off workers to reduce expenses, so that expenses would not exceed revenues. But it is a virtual truism that companies strive to ensure that expenses do not exceed revenues, and that laying off workers reduces expenses. For purposes of a TAA analysis, the salient question is "why?": Why were revenues down? For example, were lower revenues attributable in part to increased imports?

*See also* C.A.R. 55 (internal agency memorandum documenting investigation pursuant to Workers' request for reconsideration, stating simply that "BMC is experiencing global reduction in workforce, due to low earnings").

in a memorandum that consisted of a total of five sentences, in a mere five lines of text. C.A.R. 55.[33]

The Labor Department's investigation in response to the Workers' request for reconsideration was also tainted by the same methodological flaws that plagued the agency's initial investigation. Thus, for example – notwithstanding the fact that the Workers' request for reconsideration insisted that BMC "does produce an article or articles in the form of products," and even though the Workers quoted language from the BMC website referring to "products" and provided the agency with cites to locations on the BMC website where company products are sold – the Labor Department investigator accepted at face value the BMC official's statement that no products were manufactured by the company. *Compare* A.R. 53 *with* C.A.R. 55.

Similarly, although the Workers' request for reconsideration reiterated that BMC production was being shifted "offshore," and although the Workers' TAA petition had included documentation that appeared to support such allegations, the Labor Department investigator nevertheless accepted without question the BMC official's statement that "[t]here were no job transfers abroad."[34]

---

[33]In contrast to the initial investigation (where the Labor Department asked only the most basic of questions – see note 30, above), at least the agency investigator handling the Workers' request for reconsideration posed some specific questions addressing the criteria that the Labor Department was then applying in TAA cases involving the software industry. *Compare* C.A.R. 36-37 (BMC's responses to agency questions in course of initial investigation) *with* C.A.R. 55 (indicating that, in reviewing Workers' request for reconsideration, agency investigator inquired whether BMC software was "recorded on media disks, . . . mass-produced . . . [or] sold off-the-shelf").

[34]It is of little moment that the Labor Department ultimately determined that "there was no shift in production, for TAA purposes." *See* 69 Fed. Reg. at 76,783. What is significant is that, until the Workers filed the instant appeal, the Labor Department made no attempt to reconcile (and, indeed, failed even to acknowledge) the inconsistencies between BMC's statements to the agency and the information supplied by the Workers. If the agency had recognized – and sought to explore and resolve – this and some of the other apparent discrepancies between the information provided by the Workers and that provided by the company, the agency would have been alerted to the fact

*Compare* A.R. 2-3, 5-32, 53 *with* C.A.R. 55.[35]

Only after this action was filed and the voluntary remand granted did the Labor Department begin to seriously probe the merits of the Workers' TAA petition, pressing BMC (for the first time) to "provide detailed answers" supplying the "accura[te] and complete[ ]" information needed for the agency to "conduct a comprehensive investigation" of the Workers' claims (*see* S.A.R. 38-39) – information that was at the time still so conspicuously absent from the agency's files. Even a cursory review of the administrative record here makes it clear that the Labor Department could – and should – have elicited the necessary information much earlier, by scrutinizing the company's statements, seeking greater specificity and clarification, and reconciling the obvious inconsistencies in the evidence before the agency.

## B. The Labor Department's Over-Reliance on Employer-Provided Information

In its initial investigation of the Workers' petition, the Labor Department asked BMC the "ultimate question":

> Do the workers in BMC Software, Inc., Houston, TX . . . produce an article of any kind or were they engaged in employment related to the production of an article? If workers do produce an article, please explain, and what is the product?

that BMC's Senior Manager for Human Resources was a less than reliable source.

[35]As indicated in notes 20 and 26 above, the Workers' request for reconsideration further alleged for the first time that BMC products, and product components, were being imported to replace those historically produced at BMC's Houston facility. However, the Labor Department made no attempt to investigate that allegation until after this action had been filed. *Compare* A.R. 53 *with* C.A.R. 55 *and* A.R. 56-59.

C.A.R. 36-37.[36]  In effect, the agency sought to delegate to BMC's Senior Manager for Human Resources the power to decide the Workers' TAA petition.  But, "it is Labor's responsibility, not the responsibility of the company official, to determine whether a former employee is eligible for benefits."  Federated Merch., 29 CIT at ____, 2005 WL 290015 at * 6 (citation omitted).

Accordingly, the Labor Department cannot rely on employers' blanket assurances that workers were, or were not, engaged in "production."  IBM I, 29 CIT at ____, 387 F. Supp. 2d at 1351-52 (Labor Department erred in "effectively substitut[ing] the [company official's] opinion for its own inquiry into whether the products produced . . . constituted 'articles' for the purpose of [the] TAA statute"); IBM, 29 CIT at ____ & n.25, ____, 403 F. Supp. 2d at 1329-31 & n.25, 1336 (Labor Department "may not rely on the legal conclusions of others as a substitute for its own analysis of the relevant facts"; agency "cannot simply adopt as its own the legal conclusions of employers," but must instead "reach its own conclusions, based on its own thoughtful, thorough, independent analysis of all relevant record facts"; "agency may not rely on conclusory assertions by company officials – particularly not as to 'ultimate facts' and legal determinations entrusted to the agency, and particularly not where those conclusory assertions are contradicted by detailed, specific statements made by the [petitioning workers] under penalty of perjury"); EDS I, 28 CIT at ____, 350 F. Supp. 2d at 1292-93 (in relying on company official's statement that company "did not produce articles,

---

[36]The Labor Department thus failed to question BMC about the specific criteria that the agency was assertedly applying at the time in cases such as this – *i.e.*, whether the company's software is mass-replicated on physical media (such as CDs, tapes, or diskettes) and whether it is widely marketed and commercially available (*e.g.*, packaged for "off-the-shelf" sale). *Compare* IBM I, 29 CIT at ____, 387 F. Supp. 2d at 1351 (because agency obviously knows "the sometimes esoteric criteria" for TAA certification – "and the affected workers do not" – "it is incumbent upon Labor to take the lead in pursuing the relevant facts").

but provided computer related services," Labor Department improperly "substituted one . . . employee's opinion that the company did not produce 'articles' for [the agency's] own legal inquiry"); Ericsson I, 28 CIT at ____, 2004 WL 2491651 at * 7 (agency erred in relying on company official's "essentially legal conclusion" that workers "[*did*] *not produce a product*!").[37]

Indeed, to the contrary, the Labor Department has an *affirmative obligation* to conduct its own independent "factual inquiry into the nature of the work performed by the petitioners" to determine whether or not that work constituted "production." Ameriphone, 27 CIT at ____, 288 F. Supp. 2d at 1359 (*citing* Chevron I, 26 CIT at 1284, 245 F. Supp. 2d at 1327-28 (*quoting* Former Employees of Shot Point Servs. v. United States, 17 CIT 502, 507 (1993))).

Nor can the Labor Department rely on the unverified statements of company officials in the face of factual discrepancies in the record, as it did in this case. *See generally* Former Employees of Marathon Ashland Pipe Line, LLC v. Chao, 370 F.3d 1375, 1385 (Fed. Cir. 2004) (ruling that the Labor Department is entitled to base TAA determinations on statements of company officials "if the Secretary *reasonably* concludes that those statements are creditworthy" and if the statements "are not contradicted by other evidence"; but – where there is a conflict in the evidence – the Labor Department is "precluded . . . from relying on the representations by the employer" and is required to "take further investigative steps before making [its] certification decision") (emphasis added); IBM, 29 CIT at ____, ____, 403 F. Supp. 2d at 1330-31, 1336 (Labor Department cannot "rely on evidence which is fundamentally at odds with other record evidence (at least not without reconciling

_____

[37]*See also* Ameriphone, 27 CIT at ____, 288 F. Supp. 2d at 1359 (*citing* Marathon Ashland I, 26 CIT at 744-45, 215 F. Supp. 2d at 1352-53 (Labor Department's reliance on employer's conclusory assertions concerning "production" constituted impermissible abdication of agency's duty to interpret TAA statute and to define terms used in it)).

discrepancies)"; agency cannot "accept at face value information provided by a source where either (a) that information is contradicted by other evidence on the record, or (b) there is some other reason to question the veracity of the information or the credibility of the source").[38]  *Cf.* Int'l Molders and Allied Workers' Union, 643 F.2d at 31-32 (sustaining agency reliance on unverified employer response absent "objective circumstances . . . suggesting that the company gave a less than truthful response" and absent any indication "that the company would have financially benefitted from the denial of certification"); Former Employees of Gateway Country Stores LLC v. Chao, 30 CIT ____, ____, 2006 WL 539129 at * 11 (2006) (Labor may reasonably "rely upon information supplied by a company official where that information is not disputed by either party or, if there is a dispute, if Labor conducts an adequate investigation into the reliability of that information") (citations omitted).

In the case at bar, as discussed in section I.B above, BMC's Senior Manager for Human Resources stated unequivocally that BMC software is not "recorded on media disks," nor is it "mass-produced" or "sold off-the-shelf," when asked by the Labor Department investigator reviewing the Workers' request for reconsideration.  *See* C.A.R. 55.  The BMC official also denied that any jobs

---

[38]Thus, statements "that are inconsistent, uncorroborated, not entirely based on personal knowledge, and possibly biased do not constitute substantial evidence." Former Employees of Tyco Toys, Inc. v. Brock, 12 CIT 781, 782-83 (1988). *See also* IBM, 29 CIT at ____ n.27, 403 F. Supp. 2d at 1332 n.27; Ameriphone, 27 CIT at ____ n.8, 288 F. Supp. 2d at 1359 n.8; Chevron I, 26 CIT at 1283 n.9, 245 F. Supp. 2d at 1326 n.9 (and cases cited there); Former Employees of Pittsburgh Logistics Sys., Inc. v. U.S. Sec'y of Labor, 27 CIT ____, ____, 2003 WL 716272 at * 6 (2003) ("Pittsburgh Logistics I") (*citing* Former Employees of Shaw Pipe v. U.S. Sec'y of Labor, 21 CIT 1282, 1289, 988 F. Supp. 588, 592 (1997)); Former Employees of Oxford Auto. U.A.W. Local 2088 v. U.S. Dep't of Labor, 27 CIT ____, ____ & n.14, 2003 WL 22282370 at * 5 & n.14 (2003) ("Oxford Auto I") (and cases cited there); Sun Apparel I, 28 CIT at ____, 2004 WL 1875062 at * 8.

had been transferred abroad. *Id.* In fact, all of those statements were patently and demonstrably false. It is impossible to definitively discern from the record here whether or not she knew that the statements were false at the time she made them – although, candidly, it strains credulity to suggest that the Senior Manager for Human Resources of a major multinational corporation could be so ignorant of such basic information about the nature of her employer's business, much less the overall status of the company's workforce at its facilities here at home in the U.S. *versus* abroad.[39]

Each of the false statements made by BMC's Senior Manager for Human Resources was at odds with information that the Workers had provided to the Labor Department. Yet the agency never once contacted the Workers to attempt to reconcile the discrepancies, or to solicit information from them (on this, or any other, subject) – not as part of the agency's initial investigation, and not even in response to the request for reconsideration. There can be no doubt that – if the Labor Department had bothered to ask the Workers whether BMC's software is mass-replicated on physical media and is widely marketed and commercially available (*e.g.*, packaged for "off-the-shelf" sale) – the Workers would have provided to the agency the same photos of shrink-wrap

---

[39]It is astonishing that, as late as the date of BMC's return of the Confidential Data Request (in the course of the remand proceedings), BMC's Senior Manager for Human Resources was *still* maintaining that BMC "create[s] software solutions not tangible products." C.S.A.R. 92.

Other statements in BMC's response to the Confidential Data Request are equally mystifying. Incredibly, asked whether there had been layoffs, BMC's Senior Manager for Human Resources checked "unknown." C.S.A.R. 92. In response to a request for the number of production workers employed in 2002 *versus* 2003, she again stated that "BMC delivers software solutions not a tangible product." C.S.A.R. 93. Elsewhere, she reiterated that "BMC creates software solutions not tangible products such as televisions or computer hardware." C.S.A.R. 135. But she went on to concede that BMC does "reproduce software on tangible media in the form of CDs, tapes and paper at the subject plant (Houston, TX). *Id*. *See also* C.S.A.R. 157 (same).

software that they appended to their Complaint filed with the court.[40]  But the Labor Department

never asked, and instead accepted as gospel truth the unsubstantiated representations of the BMC

human resources official.

As section I.A above observes, the methodology used to conduct TAA investigations is – as

a general principle – committed to the sound discretion of the agency.  But it is difficult to fathom

why Labor Department investigators continue to rely so heavily on employers, virtually to the

exclusion of petitioning workers.  A review of the administrative records in TAA cases filed with

the court reveals that agency investigators only relatively rarely contact petitioning workers to seek

additional information, documentation, or clarification.[41]  In contrast, investigators seem almost

---

[40]The Labor Department emphasizes that, until the Complaint was filed, it had not seen the Workers' "photocopied pictures of [BMC's] packaged software."  69 Fed. Reg. at 76,783. According to the Labor Department, it was those photos that caused the agency to "identif[y] the need to resolve the apparent conflict between information provided by the petitioners and that provided by the employer," resulting in the agency's request for a voluntary remand.  *Id*.

As noted immediately above, however, the Labor Department would have had access to the photos earlier, had it bothered to contact the Workers in the course of either its initial investigation or its investigation in response to the Workers' request for reconsideration.  Even more to the point, as discussed in note 24 and elsewhere, the record before the agency was replete with "apparent conflict[s] between information provided by the petitioners and that provided by the employer" even *without* the photos – as the Government itself conceded in requesting a voluntary remand from the Court.  *See* [Defendant's] Second Amended Motion for Voluntary Remand (July 6, 2004).  But those conflicts were either ignored or overlooked by the agency, until the Workers sought recourse in this forum.

[41]In those rare cases where Labor Department investigators actually have contacted petitioning workers, it has generally been only after an initial negative determination has been rendered, and the workers have sought reconsideration or have filed a challenge in court.  *See*, *e.g.*, EDS I, 28 CIT at _____, 350 F. Supp. 2d at 1285 (noting that, in response to request for reconsideration, agency investigator contacted one of the petitioning workers).  *But see* IBM I, 29 CIT at _____, _____, 387 F. Supp. 2d at 1348, 1350 (indicating that agency had some minimal contact with two of the petitioning workers in course of initial investigation).

gullible in their willingness to accept at face value virtually *anything* an employer says – typically without even confronting the employer with other, conflicting information provided by petitioning workers (or sometimes the employer itself).[42]

In a nutshell, the Labor Department views employers as presumptively reliable sources, and treats any information that they provide as though it "trumps" information provided by petitioning workers. The agency maintains that an employer has no reason to lie, and has "[no] interest in the outcome of [a TAA case] that might . . . be[ ] adverse to its former employees." Former Employees of Barry Callebaut v. Chao, 357 F.3d 1377, 1381 (Fed. Cir. 2004).[43]

*Au contraire*. The Labor Department's position on the reliability of company statements is simplistic and naive, at best – for, just as the Labor Department seems to impute to *petitioning*

---

[42]*See* Harper's Magazine at 63 (noting that, notwithstanding significant employer incentives to be less than forthcoming about the circumstances surrounding layoffs, "the Labor Department routinely privileges information from the company over information from workers").

[43]*See also*, *e.g.*, Int'l Molders and Allied Workers' Union, 643 F.2d at 31-32 (sustaining agency reliance on unverified employer response absent "objective circumstances . . . suggesting that the company gave a less than truthful response" and absent any indication "that the company would have financially benefitted from the denial of certification"); Chevron I, 26 CIT at 1282 n.8, 245 F. Supp. 2d at 1325 n.8 (noting, then rejecting, Government's claim that there was "no evidence that [company] officials were uncooperative or less than forthright during Labor's investigation").

It is telling that, for example, in Chevron, one current company official feared retaliation by his employer for the assistance he rendered to the petitioning workers. *See* Chevron I, 26 CIT at 1272, 245 F. Supp. 2d at 1320. *See also*, *e.g.*, IBM I, 29 CIT at ____, 387 F. Supp. 2d at 1350-52 (employer apparently failed to complete and return agency TAA questionnaire, and was otherwise "very dilatory"; Defendant's Consent Motion for Voluntary Remand (Oct. 7, 2003), *filed in* Former Employees of Mellon Bank, N.A., Court No. 03-00374 (expressing concern as to employer responsiveness to agency inquiries for additional information); Whitin Machine Works, 554 F.2d at 500 (expressing incredulity and describing as "bizarre" employer's "attempt[ ] to terminate [a TAA investigation] which could result in substantial benefits to many of its present and former employees").

*workers* a motivation to stretch the truth in an effort to secure TAA benefits, so too *employers* have

certain inherent incentives to be less than candid and fully forthcoming as well.  *See*, *e.g.*, Tyco

Toys, 12 CIT at 782-83 (remand ordered, based on court's finding that sole source on which agency

relied for information evidenced "a certain bias against provision of trade adjustment funds to the

claimants").

Particularly in today's social and political climate – a time when issuing pink slips,

padlocking factory doors, or outsourcing production to India or China may trigger a consumer

boycott, make a company the lead story on "Lou Dobbs Tonight,"[44] or get the company's chief

executive branded a "Benedict Arnold CEO"[45] – some employers may be understandably reluctant

---

[44]The recent Harper's Magazine exposé of the Labor Department's administration of the TAA program questioned the agency's blind reliance on information supplied by employers "despite the fact that many executives, *fearing nothing so much as the wrath of Lou Dobbs*, are less than eager to admit to shipping work overseas."  Harper's Magazine at 63 (emphasis added).

For months, one of the most popular recurring segments on CNN's "Lou Dobbs Tonight" – titled "Exporting America" – covered issues such as free trade agreements, the U.S. trade deficit, and "outsourcing," shining an often-unwelcome spotlight on U.S. corporations reported to be outsourcing jobs.

The TV program's website (at www.cnn.com) includes a link to transcripts of past shows (including segments on topics ranging from "Does Job Retraining Work?" and "Growing Backlash Over Outsourcing," to "Small and Medium-Size Business Now Exporting American Jobs Overseas").  At one point, the website also featured a link captioned "Exporting America: List of companies exporting jobs."  (BMC Software appears on the list, which is now archived at http://www.cnn.com/CNN/Programs/lou.dobbs.tonight/popups/exporting.america/content.html (last visited Aug. 31, 2006).)  *See generally* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 821-22 n.110 (discussing Lou Dobbs' focus on "Exporting America").

*See also* GAO Report 04-1012 at 16-17 (reporting that trade-affected companies are sometimes "unwilling" to provide lists of workers affected by layoffs).

[45]In the course of the 2004 Presidential campaign, Democratic nominee Senator John Kerry famously denounced as "Benedict Arnold CEOs" corporate executives who outsourced

to acknowledge layoffs and the reasons for them.  Thus, in Bell Helicopter, for example, the court

properly criticized the Labor Department's reliance on information provided by company officials,

emphasizing that:

> [Both company officials] had serious adverse interests to acknowledging or
> confirming that the job losses were due to the fact that [the firm] could pay
> Canadians less than Americans . . . [and] . . . intended to do just that.  *The public
> relations implications alone were enough to cast a cloak of suspicion over* [*the
> firm's*] *responses*, *both in terms of veracity and completeness.*

Bell Helicopter, 18 CIT at 326 (emphasis added).[46]

Similarly, employers have an incentive to downplay the circumstances surrounding layoffs

if they fear that the publicity that may accompany a full-blown TAA investigation (and possible

eventual certification) may be exploited by their competitors, or may negatively affect their stock

prices or financial ratings, or may have an adverse impact on their relationships with their suppliers

or their "downstream" finishers, by signaling that they may be having financial difficulties.  Thus,

---

manufacturing operations, "tak[ing] American jobs and money overseas."  *See*, *e.g.*, Hon. John
Kerry, Town Hall Meeting, Vinton, IA (Jan. 13, 2004) (transcript available at 2004 WL 62479).

[46]No employer relishes headlines like "Shipped Out – The Story of How AT&T Moved 3,500
Workers to a New 'Career' at IBM – Knowing It Wouldn't Last."  *See* IBM I, 29 CIT at \_\_\_\_, 387
F. Supp. 2d at 1347 (*quoting* headline of news article in *The Star Ledger*, August 25, 2002).
Similarly, the record in another, unrelated IBM case included a *New York Times* news clipping
reporting on a conference call in which "two senior I.B.M. officials told their corporate colleagues
around the world . . . that I.B.M. needed to accelerate its efforts to move white-collar . . . jobs
overseas *even though that might create a backlash among politicians and its own employees*."  *See*
IBM, 29 CIT at \_\_\_\_ n.26, 403 F. Supp. 2d at 1332 n.26.

*See also* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 821-22 n.110 (*citing* another
"example of the bad public relations associated with outsourcing on a local level"); *id.* (emphasizing
need for Labor Department to take measures to ensure "that the [former employer's] answers [to
agency requests for information] are not tinged with concern for the company's public image,"
particularly since "some companies have been wary to be seen as contributing to the 'outsourcing'
trend").

for example, a company subject to a TAA investigation may harbor concerns that, if its suppliers

become skittish about the company's solvency, they may impose more stringent payment terms on

the company, refuse to extend credit to it, or cease doing business with it altogether.  And a

company's "downstream" finishers may begin to contract with other sources of work to replace the

stream of work historically generated by the company, if they suspect that the company may be

beginning to scale back production or preparing to close its doors entirely.[47]

In other cases, company officials simply may not understand that the TAA program differs

from the unemployment compensation system, where an employer has a clear financial stake in

minimizing the amount paid to former employees on unemployment claims.[48]  Or companies may

---

[47]*See*, *e.g.*, GAO Report 04-1012 at 24-25 (reporting that "some trade-affected employers are reluctant . . . to provide the names of suppliers that may also be affected by their shutdown or reduced production.  For example, [some state] officials . . . told [GAO] that employers are sometimes hesitant to share this information because *they do not want their suppliers to know that they are having financial difficulties*.") (emphasis added).  *See also id*. at 4 (noting that "trade-affected companies may be reluctant . . . to provide lists of firms that supply them with component parts").

[48]Employers typically are familiar with the unemployment compensation system, and may assume (wrongly) that the TAA system operates in a similar fashion.  The size of an employer's annual unemployment tax assessment is based, in significant part, on the amount that has been paid out by the state to the company's former employees on unemployment compensation claims. Employers thus have a very real financial incentive to seek to minimize the payment of unemployment compensation to their former employees.  In contrast, an employer pays no part of the assistance awarded to former employees under the TAA system.  *Cf*. Jerome Hanifin, "A Short History of a TAA Case: Former Employees of Oxford Automotive v. U.S. Department of Labor," Litigating Trade Adjustment Assistance Cases Before the United States Court of International Trade, Customs & International Trade Bar Association and American Bar Association seminar, Princeton Club, New York, NY, April 19, 2005, at 13 ("Hanifin") ("Even though certification for TAA benefits entails no added cost to the employer, in all too many cases the employer has provided suspect or outright false information to Labor."); IBM, 29 CIT at ____ n.37, 403 F. Supp. 2d at 1336 n.37 (directing that, "[t]o help ensure the completeness and accuracy of information obtained on remand, the Labor Department shall expressly advise and assure all its contacts at [the former employers] that – *unlike regular unemployment compensation*, for example – the TAA certification

lack ready access to all the information that the Labor Department seeks.[49]  In some cases (and

perhaps this case), the company officials who respond to the Labor Department's inquiries may not

intend to mislead the agency, but instead may simply lack the requisite knowledge of the company's

product lines, markets, and operations.  *See*, *e.g.*, Sun Apparel I, 28 CIT at ____, 2004 WL 1875062

at * 7 (lambasting Labor Department for relying on information provided by employer's  human

resources manager which was "inconsistent, contradictory, and *evidence*[*d*] *an apparent lack of

comprehension of the full array of operations, tasks, and activities*" of company personnel)

(emphasis added); IBM, 29 CIT at ____, 403 F. Supp. 2d at 1322 (criticizing agency for relying on

information provided by company official who "later disclaimed 'any firsthand knowledge of daily

work activities of the [petitioning workers],' and recommended that 'someone else at [the company]

should be contacted for additional information'"); Pittsburgh Logistics I, 27 CIT at ____, 2003 WL

716272 at * 7 (noting that "[t]he Court does not presume that the Employment Development

Specialist . . . located in Rochester [New York] who responded to the [agency] investigator's

questions about the petitioners was 'in a position to know' the extent of the petitioners' jobs in

Independence [Ohio]").[50]

_____

of the [petitioning workers] would involve no expense whatsoever on the part of the companies").

[49]*See*, *e.g.*, GAO Report 04-1012 at 4 ("trade-affected companies may . . . find it difficult to provide lists of firms that supply them with component parts"), 16-17 (reporting that trade-affected companies are sometimes "unable" to provide lists of workers affected by layoffs), 24 ("some trade-affected employers . . . find it difficult to provide the names of suppliers that may also be affected by their shutdown or reduced production"), 25 ("smaller employers may find it difficult to provide information on their suppliers or finishers because they do not have this information readily available").

[50]In some cases, the problem may lie (at least in part) with the Labor Department's usual practice of using a generic, "one-size-fits-all" Business Confidential Data Request standard form

In sum, for all these reasons and more, there is no apparent rational basis for treating information supplied by employers as inherently and necessarily more reliable and authoritative than that provided by petitioning workers – particularly where the employer's information is unsworn, unverified, and uncorroborated, or where it conflicts with information submitted by the petitioning workers.[51]

---

questionnaire to attempt to elicit the requisite information from employers in TAA cases. *See generally* S.A.R. 43-47 (blank Business Confidential Data Request questionnaire form, sent to BMC by the Labor Department in the course of the remand proceedings in this case); "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 818-19 (criticizing Labor Department's employer questionnaire process).

Because the agency's standard form questionnaire is not tailored to any specific *industry* (much less the particular *company* at issue in a particular case), it is difficult not to sympathize with company officials who are confronted with the challenge of trying to complete the form as best they can.

Of course, the Labor Department could undertake to develop specialized questionnaires for particular industries. *Cf.* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 823-26 (proposing that Labor Department convene inter-disciplinary working groups for various major industries, to – *inter alia* – develop industry-specific definitions of "production"). However, particularly if the Labor Department continues to use a generic standard form questionnaire for all employers, it is incumbent on the agency to follow up on companies' responses, to ensure that the information on which agency determinations are based is accurate, and has not been distorted or misinterpreted due to the agency's reliance on a very generic form questionnaire. *See generally* United Glass & Ceramic Workers v. Marshall, 584 F.2d 398, 404-05 (D.C. Cir. 1978) (noting that TAA program requires Labor Department "to investigate a wide range of industries," and that agency's investigative techniques must necessarily "vary with the structure of the industry, the available sources of information, and the number of other causative factors at work").

[51]In the interests of accuracy and efficiency, Labor Department investigators would be well advised to contact both the employer *and* the petitioning workers in the course of the agency's initial investigation. And, of course, investigators are obligated to seek clarification to resolve any apparent conflicts or discrepancies in the record before them.

Moreover, while it may be true – as the Labor Department has argued elsewhere – that "there is no requirement that any statement upon which Labor relies must be verified in accordance with the requirements of 28 U.S.C. § 1746," there can be little doubt that the information provided to the

agency generally would be more accurate and more complete if respondents (companies and petitioning workers alike) were required to file their submissions under oath. *See* Barry Callebaut, 357 F.3d at 1381. *See also id.* at 1383 (sustaining Labor Department's claim that workers were not entitled to TAA certification, largely on the strength of sworn employer affidavits submitted to the agency, which – the appellate court emphasizes – included solemn oath acknowledging liability for perjury; "those affidavits were sufficiently trustworthy to constitute substantial evidence").

Indeed, company officials and displaced workers alike may be held liable for material false statements made to the Labor Department in the context of a TAA investigation *whether those statements are oral or in writing*, *and even if they are not made under oath. See* 18 U.S.C. § 1001 (subjecting to fine and/or imprisonment for up to five years anyone who "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation"); United States v. Krause, 507 F.2d 113, 117 (5th Cir. 1975) (federal material false statements statute applies "to oral as well as written statements and unsworn as well as sworn statements"); IBM, 29 CIT at ____ n.37, 403 F. Supp. 2d at 1336 n.37 (*citing* federal material false statements statute at 18 U.S.C. § 1001, and directing that – to "help ensure the completeness and accuracy of information obtained on remand" –  the Labor Department "shall caution all contacts that they will be held personally accountable by the Court for all information that they provide in the course of the agency's investigation, whether their statements are oral or in writing, and even if they are not made under oath").

The reliability of information depends, in equal measure, both on the knowledge and authority of the source of the information, and on that source's honesty.  If the Labor Department believes that BMC's Senior Manager for Human Resources actually did not know that her statements were false, it is entirely unclear (based on its experience in this and many other such cases) why the agency persists in treating employers' human resources executives as *authoritative*, *knowledgeable* sources in TAA investigations.  If – on the other hand – the Labor Department believes that BMC's Senior Manager for Human Resources intentionally prevaricated, it is not only unclear why the agency continues to treat employers' human resources executives as presumptively *honest* sources, but it is also unclear why the agency apparently routinely permits them to lie with impunity. *See*, *e.g.*, "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 820-21 & n.106 (criticizing Labor Department's pattern of relying on companies' human resources personnel, observing that "the Human Resources department appears to be [the Labor Department's] primary source in investigations," and emphasizing that "[i]n most cases, the data they provide is lacking in some respect"); Sun Apparel I, 28 CIT at ____, 2004 WL 1875062 at * 5 (agency sought to defend its reliance on information provided by employer's Human Resources manager, based on official's "credibility" and "position within the company").

In any event, it is possible that, had the Labor Department required BMC's Senior Manager for Human Resources to submit her responses to the agency's questions under oath, she would have

answered truthfully and accurately, or – if she were uncertain as to the answers – she would have referred the agency's inquiries to some other company official for their response. (It is interesting to note that, in its initial contact with BMC after the Court remanded the case to the agency, the Labor Department pointedly admonished that "the company official who signs the CDR [Confidential Data Request questionnaire response] *will be responsible for the accuracy and completeness of the information* contained therein." *See* S.A.R. 39 (emphasis added). That warning – as much as anything – may be the reason that this matter was kicked up to the office of BMC's General Counsel, and finally got the attention that it deserved. *See* C.S.A.R. 50 (letter from BMC's Senior Legal Counsel, assuring Labor Department that "BMC Software is very interested in cooperating" with agency investigation).)

Certainly a referral to the U.S. Attorney for potential prosecution under 18 U.S.C. § 1001 of a corporate executive for material false statements made to the Labor Department in the course of a TAA investigation would get the attention of other employers elsewhere across the country, and send a strong message to company officials everywhere about the importance of responding to the agency's inquiries accurately and completely.

Ultimately, of course, it falls to the Labor Department to decide how best to ensure the reliability of the information on which its TAA determinations are based. *See generally* Former Employees of CSX Oil & Gas Corp. v. United States, 13 CIT 645, 651-52, 720 F. Supp. 1002, 1008 (1989); Hawkins Oil & Gas II, 17 CIT at 130, 814 F. Supp. at 1115.

The agency may – for example – choose in the future to channel its inquiries to employers through the companies' general counsels' offices (which, in this post-Enron era, are likely to be uniquely sensitive to the importance of accuracy and completeness in responding to federal investigations). *See generally* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 820-22 (recommending that Labor Department "direct all questionnaires to in-house counsel, or if there are none, to the company's outside legal counsel," theorizing that agency could then "rely on the standards of legal professional ethics in demanding that information be provided in a complete and accurate manner"), 820 n.106 (observing that "the Human Resources department appears to be [the Labor Department's] primary source in investigations," but that "[i]n most cases, the data they provide is lacking in some respect"); IBM I, 29 CIT at ____, ____, 387 F. Supp. 2d at 1348, 1350-52 (noting that agency investigator contacted company's in-house counsel).

Or the agency may choose to caution all respondents (including company officials and petitioning workers alike) that they may be subject to prosecution for material false statements; or the agency may choose to require that all information provided to it be submitted under oath. *See*, *e.g.*, U.S. Department of Agriculture, Form FSA-229, "Application for Trade Adjustment Assistance (TAA) for Individual Producers" (Ag-TAA Application) (cautioning Ag-TAA applicants that, *inter alia*, "[t]he provisions of criminal and civil fraud statutes, including 18 USC 286, 287, 371, 641, 651, 1001; 15 USC 714m; and 31 USC 3729, may be applicable to the information provided");

The court's reach may or may not extend to employers who provide incomplete, false, or misleading information to the Labor Department; but clearly the Labor Department is well within its grasp. And the agency's persistent failure to verify the accuracy of the information on which it relies – as well as its pattern of turning a blind eye to obvious inconsistencies and discrepancies in the record before it – is beginning to verge on contempt for administrative and judicial process, and

---

"Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 821 n.109 (*citing* source "suggesting as an improvement to TAA that [the Labor Department] demand 'accurate information' from corporate management"). *See also* 19 U.S.C. § 2321 (authorizing Labor Department to "subpena the attendance of witnesses and the production of evidence necessary . . . to make a determination" on a TAA petition, and authorizing judicial enforcement of such subpoena); Whitin Machine Works, 554 F.2d 498 (upholding subpoena issued in TAA investigation by Labor Department, compelling employer to produce to agency "sales, production, and inventory data for three years, separately identified by product; employment data, including average weekly and monthly employment; data as to quantity and value of [employer's] imports, identified by product lines; and the percentage of production and sales accounted for by [employer's] exports").

Or the agency may choose to verify all information on which it relies by seeking independent corroboration. *See*, *e.g.*, Sun Apparel I, 28 CIT at ____, 2004 WL 1875062 at * 8 (castigating Labor Department for agency's failure "to require any documentary or other evidence to support the HR manager's assertions, to verify the company's responses, or to otherwise ensure the truthfulness of the HR manager's claims" which conflicted with information provided by petitioning workers); "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 822-23 (asserting that agency investigations should be required to include, in addition to information supplied by employer, "objective, third party evidence" such as "trade-specific publications, trade data for an industry, consultations with industry experts, etc."). *But cf*. Int'l Molders and Allied Workers' Union, 643 F.2d at 31-32 (sustaining agency reliance on unverified employer response absent "objective circumstances . . . suggesting that the company gave a less than truthful response" and absent any indication "that the company would have financially benefitted from the denial of certification").

Or the agency may devise other suitable means to protect the integrity of its process. What the Labor Department emphatically *may not* do is ignore or dismiss the statements of petitioning workers while treating as gospel the conflicting, unsworn, and uncorroborated statements of company officials (who may not even necessarily be speaking to matters within their competence).

does a grave disservice to the hardworking men and women of this country.[52]

C.   The Labor Department's Failure to Consult
Other Publicly-Available Sources of Information

---

[52]The persistent problems that the Court of International Trade has identified in recent years apparently are nothing new.

More than a decade ago, an audit of the TAA program conducted by the U.S. General Accounting Office (now known as the "Government Accountability Office") ("GAO") concluded that "[p]roblems in the TAA certification process raise questions about how Labor determines worker eligibility. Flaws in Labor's petition investigations . . . may result in petitions not being filed or erroneous decisions to approve or deny assistance to workers." GAO/HRD-93-36, "Dislocated Workers: Improvements Needed in Trade Adjustment Assistance Certification Process," Oct. 1992, at 3 ("GAO Report 93-36").

The GAO audit found that "flawed investigations were conducted in 63 percent of the petitions filed" during the period under review, and that "[a]s a result of these flaws, workers entitled to TAA benefits may have been denied needed assistance." *Id*.

Of particular moment here, the GAO identified as a "major" problem the Labor Department's practice of relying on "incomplete, inaccurate, or unsubstantiated" information provided by employers. *Id*. at 5. The GAO report explained:

> For example, in one case, Labor relied on unsubstantiated information regarding the parent company's import practices and denied the petition. Only after union officials intervened on behalf of the workers did Labor learn that the company was importing goods from its foreign operation. As a result, Labor reversed its position and certified the workers.

> Labor's reliance on unsubstantiated company testimonial evidence . . . has also been questioned by the U.S. Court of International Trade. For example, the court remanded one case to Labor for further investigation because Labor had ". . . relied on questionable data including inconsistent sources, and uncorroborated and possibly biased testimony."

*Id*. Incredibly, more than a dozen years after the GAO condemned the practice, the Labor Department still routinely bases its TAA certification determinations on "incomplete, inaccurate, [and] unsubstantiated" information provided by employers.

Even apart from the Labor Department's blind faith in information provided by employers, the agency's failure to solicit information from petitioning workers, and its willingness to ignore apparent inconsistencies in the record before it, there is yet another problem with the agency's investigations:   Here, as elsewhere, Labor Department investigators failed to make use of valuable sources of information that are readily available to them.[53]

For example, the Labor Department's standard form Petition for Trade Adjustment Assistance asks that petitioning workers supply the web address for their former employer.  The Workers here complied with that request.  *See* A.R. 2 (providing company web address, www.bmc.com).

Agency investigators apparently never consulted the company's website, however.  Had they done so, they would have discovered that the website states that BMC's "SIC" code – "Standard Industrial Classification" code – is 7372, which is the classification code for "*Prepackaged Software.*"   (Emphasis added.)[54]   The agency investigators also would have been able

---

[53]*See*, *e.g.*, Letter from the Court to Counsel for Defendant (March 19, 2004), *filed in* Former Employees of Paradise Fisheries v. United States, Court No. 03-00758 (criticizing Labor Department for six-month delay in TAA certification of workers, which resulted from failure of agency personnel to perform simple search of online version of Federal Register); Ericsson I, 28 CIT at ____, 2004 WL 2491651 at * 5 (faulting Labor Department for failure to review information on corporate website of petitioning workers' former employer).

[54]*See*, *e.g.*, BMC website, "BMC Software Vendor Fact Sheet" (identifying BMC's SIC code as 7372).

As noted in section I.B above, the internal agency memorandum documenting the Labor Department's initial investigation in this case indicates that BMC's SIC code is 7371 – the code for "Computer Programming Services."  *See* C.A.R. 42-43.  However, there are several problems with that statement.

First, the Labor Department's statement has no apparent basis in the administrative record.

The source of the information simply is not cited.

Second, as this note details, the accuracy of the Labor Department's statement is subject to question. Whatever the source of the agency's information (which is not disclosed in the record), both BMC's own website and the website of the U.S. Securities and Exchange Commission identify BMC's SIC code as 7372 – "Prepackaged Software." *See generally* section I.B & n.18, *supra* (explaining SIC system). In the context of a TAA investigation the distinction between "production of an article" and "delivery of services" may be critical.

And, third (and most importantly), not only is an employer's SIC (or NAICS) code *not determinative* in a TAA case, it is essentially *irrelevant*. Thus, for example, the Labor Department itself now has determined that the employer in this case, BMC, is engaged in the production of an article – even though both SIC codes 7371 and 7372 are, in fact, "services" codes under the Standard Industrial Classification system. *See also* Merrill Corp. II, 29 CIT at ____, 387 F. Supp. 2d at 1345 (stating that "[s]ources such as the SIC 'do not speak to the definition of the word "article" as used in the [Trade] Act, but rather to the categorization of industries for entirely other purposes,'" and that "[t]he SIC code Labor deemed applicable to [the company's] business is irrelevant" in such a situation) (*quoting* Murray Engineering II, 28 CIT at ____ n.8, 358 F. Supp. 2d at 1273 n.8); Murray I, 28 CIT at ____, 346 F. Supp. 2d at 1289 (holding that an employer's NAICS code is "not relevant" in a TAA case). *Cf.* IBM I, 29 CIT at ____, 387 F. Supp. 2d at 1348-49 (finding that NAICS failed to address issues raised by petitioning workers).

It bears noting that the case at bar is not an isolated case. There have been discrepancies in SIC and NAICS codes in other cases as well. For example, in reaching its negative determination in Merrill, the Labor Department identified Merrill's SIC code as 7334 – "Photocopying & Duplicating Services," a "services" code under the Standard Industrial Classification system. *See* Merrill Corp. II, 29 CIT at ____, 387 F. Supp. 2d at 1345. However, the SEC's website states that the SIC code for Merrill is 2750 – "Commercial Printing," which is a "manufacturing" code (*i.e.*, "Manufacturing – Printing, Publishing, and Allied Industries").

The Labor Department's use of SIC and NAICS codes in TAA cases was ill-conceived from the start. Contrary to the agency's implication, "[v]arious Federal government agencies maintain their own lists of business establishments, and assign classification codes based on their own programmatic needs." *See* "Ask Dr. NAICS" (available on website of U.S. Census Bureau). Accordingly, as the Census Bureau's website makes clear: *"There is no central government agency with the role of assigning, monitoring, or approving NAICS codes for [business] establishments. Individual establishments are assigned NAICS codes by various agencies for various purposes using a variety of methods." Id.* (emphasis added). A company's classification codes therefore "will vary by agency." *Id.* Indeed, "some agencies assign more than one NAICS code" to a single company, with some agencies "accept[ing] up to 5 or 10 classification codes" per company. *Id.* Moreover, "NAICS was designed . . . in such as way as to allow business establishments to *self-code*." *Id.*

to access BMC's Form 10-K for the Fiscal Year Ended March 31, 2003 (filed in mid-June 2003) –

the most recent report as of the date of the Workers' termination.  That report describes the work

of BMC's Houston facility as "manufacturing," and explains that the company sells its software both

"in object code form" and "on a shrink wrap basis."[55]   Of course, the fact that BMC sells

"prepackaged software" in "shrink wrap form" was critical to the merits of the Workers' TAA

petition, under the criteria that the Labor Department was applying at the time.

By regulation, the Labor Department is required "to marshal all relevant facts to make a

determination" on TAA petitions.  29 C.F.R. § 90.12.[56]  In light of that obligation, the agency's

failure to avail itself of resources such as company websites and Form 10-Ks in cases such as this

is utterly incomprehensible.[57]  Here, a few quick clicks of a computer mouse by a Labor Department

---

(emphasis added).  And, finally, "NAICS was developed specifically for the collection and publication of statistical data to show the economic status of the United States.  *The NAICS categories and definitions were not developed to meet the needs of . . . regulatory applications*" such as the TAA program at issue here.  *Id*. (emphasis added).

[55]*See* BMC Form 10-K, at C.S.A.R. 490-91 (stating that "[p]roduct manufacturing and distribution for the Americas are based in Houston" and in California), 493 (stating that BMC software is distributed both "in object code form" and "on a shrink-wrap basis"); *see also id*. at 488 (noting that, beginning with Form 10-K for Fiscal Year ending March 31, 2003, all of BMC's SEC filings are being posted on company website).

[56]All references to regulations herein are to the 2003 version of the Code of Federal Regulations.

[57]The SEC's website offers free access to the 10-K forms (which identify, *inter alia*, SIC codes) of those companies that are required to file with the agency.  It is an extremely quick and easy search.  A researcher simply types in the name of the subject company, presses "search," and *voila*!  Up pops a menu of the complete text of the company's SEC filings from 1993 to date, available online through the agency's "EDGAR" database.

*See also* Hanifin at 6-7 (discussing submission of employer's Form 10-K to Labor Department in a TAA case to substantiate validity of petitioning workers' claims).

investigator would have sufficed to expose the falsity of the information provided to the agency by

BMC's Senior Manager for Human Resources, and would have resolved at least some of the issues

central to the agency's analysis of the Workers' right to TAA certification.[58]  *See generally*

"Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 822-23 (asserting that Labor Department

investigations should be required to include, in addition to information supplied by employer,

"objective, third party evidence" such as "trade-specific publications, trade data for an industry,

consultations with industry experts, etc.," and arguing that the absence of corroboration by such

"third party sources" should be deemed "prima facie evidence that [the Labor Department] did not

conduct a reasonable investigation").

### D.  The Impact of the Labor Department's Cavalier Approach to Remands

This case is troubling enough viewed in isolation.  But it is even more disturbing when it is

viewed in the context of other TAA cases appealed to the court in recent years.  As Ameriphone

noted, the Labor Department's *modus operandi* increasingly is to seek a voluntary remand in TAA

cases that are appealed to the court.  Ameriphone, 27 CIT at ____, 288 F. Supp. 2d at 1359.[59]

Requests for voluntary remands have become all but routine.[60]

---

[58]*See* Oxford Auto I, 27 CIT at ____ & n.14, 2003 WL 22282370 at * 5 & n.14 ("Labor erred by failing to verify the statements [of a company official] that seemed at odds with [the company's] Form 10-K") (citations omitted).

[59]*See also* Hanifin at 3 (noting that "[i]t seems to be standard operating procedure in TAA cases for the Department of Justice attorney representing Labor to immediately ask for a voluntary remand when a case challenging a denial is filed").

[60]The statistics reported in one analysis are striking:  "From January 2001 through October 2004, seventy-four TAA appeals were filed with the Court of International Trade; in forty-two of them, lawyers for the Labor Department requested a 'voluntary remand,' apparently so that they

Counsel for the Government have elsewhere sought to defend the agency's knee-jerk filing of motions for voluntary remand as "a reasonable and efficient opportunity for Labor to conduct further investigation as to whether the [denial of] certification . . . is supported by substantial evidence."[61] But that reflects a curiously perverted view of the administrative and judicial processes. The Labor Department is obligated by statute to thoroughly investigate all TAA petitions and to compile complete records to support its determinations *before* cases reach the court. And the "substantial evidence" test is to be applied *not* by the agency, but – rather – by the court.

Moreover, there are a number of significant concerns inherent in the Labor Department's practice of routinely seeking (and, for that matter, the court's practice of reflexively granting) voluntary remands in TAA cases.

One concern is that voluntary remands effectively enable the Labor Department to paint a misleading portrait of the calibre of its investigations and the bases for its determinations. By definition, a voluntary remand affords the Labor Department an opportunity to "doctor" the record of its initial investigation, by eliciting information that the agency should have obtained previously, and then using that information to "beef up" the administrative record before the agency's determination is subjected to judicial review. By doing so, the Labor Department avoids much of the harsh criticism it would have drawn had a court reviewed the agency's determination based solely on the record developed in the initial investigation.

---

could have more time to investigate and substantiate a case that should already have been thoroughly considered." *See* Harper's Magazine at 63. A more recent analysis of TAA cases filed with the court confirms that voluntary remands are even more common now, and – indeed – are sought in the vast majority of cases. *See* section II.E, *infra*.

[61]*See* McCarthy at 14.

However critical of the Labor Department the TAA case law has been to date, there can be little doubt that it would be even more blistering if – in lieu of granting agency motions for voluntary remand – the courts instead denied such requests, forced the agency to attempt to defend its determinations on the basis of the meager record compiled in the course of its initial investigations, and based their first opinions in every case solely on that record, cataloguing the flaws and deficiencies in the investigation that the agency would have sought to cure had a voluntary remand been granted.[62]   In sum, the reported decisions of the court do not accurately reflect the Labor Department's administrative processes.  Through the procedural vehicle of voluntary remands, the agency is able to sweep much of the worst of its dirt under the rug.

Delay is another critical issue.  The Government's position on the acceptability of routine requests for voluntary remands suggests that it believes that there is "no harm, no foul" inherent in such an approach.  Nothing could be further from the truth.  It is no answer for the Labor

---

[62]As the Court of Appeals has noted, where an agency "request[s] a remand (without confessing error) in order to reconsider its previous position," "the reviewing court has discretion over whether to remand."  SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (citations omitted).

Indeed, in SKF, the Court of Appeals expressly recognized that a remand "may be refused if the agency's request is frivolous or in bad faith":

> For example, in Lutheran Church-Missouri Synod v. Fed. Communications Comm'n, 141 F.3d 344, 349 (D.C. Cir. 1998), the Court of Appeals for the District of Columbia Circuit refused the FCC's "novel, last second motion to remand," noting that the remand request was not based on a confession of error and was instead based on a prospective statement which would not bind the FCC. *See id*. The court added that "*the Commission has on occasion employed some rather unusual legal tactics when it wished to avoid judicial review, but this ploy may well take the prize*."

SKF, 254 F.3d at 1029 (emphasis added).

Department to "wait and see" whether a denial of TAA certification is challenged in the courts, and

then – if it is – to seek a voluntary remand to belatedly conduct the thorough probe to which *all*

petitioning workers are entitled by law at the administrative level.

The Labor Department simply cannot pretend that certifying workers *after* a court case has

been filed, and *after* a supplemental investigation has been conducted in the course of a voluntary

remand, can ever even begin to make those workers whole and put them in the same position that

they would have been in had the agency conducted a proper initial investigation and granted the

workers timely relief, within the 40 days mandated by statute.  Marathon Ashland aptly noted:

"TAA cases are different from most litigation before this court.  This is not a situation, such as in

customs or antidumping duty cases, where a bond can be posted to cover anticipated cost and reduce

liability."[63]      Former Employees of Marathon Ashland Pipeline, LLC v. Chao, 27 CIT \_\_\_\_,

---

[63]Workers who are belatedly awarded TAA benefits receive no interest or other compensation for the delay that they suffer.  At best, such workers receive – months (or even years) after the fact – the same funds and training that they were entitled by statute to receive much earlier.  Worse yet, all too often, delay effectively operates to reduce (and conceivably even eliminate) benefits to which workers are otherwise entitled by law.

For example, training is perhaps the key TAA benefit for most displaced workers.  However, federal funds for TAA-related training are administered on a state-by-state basis; and (due to problems in the design and administration of the system, coupled with demand attributable to the overall state of the economy) many states have run out of training funds in recent years.  In such cases, workers who would have been able to receive training if they been timely certified by the Labor Department may instead be deprived of training benefits because the agency failed to conduct an adequate initial investigation of the workers' petitions –  and, by the time the workers were finally certified (*e.g.*, after actions were filed in court, and proper agency investigations conducted on remand), training funds in their states were depleted.

Moreover, in many cases, workers who have been forced to defer their training due to such funding shortfalls have exhausted much (if not all) of their stream of TAA income support payments ("Trade Readjustment Allowance" or "TRA" payments) by the time additional training funds become available.  With few or no TRA payments forthcoming (to help cover their living expenses

while they are enrolled in training), the workers often are forced either to forego training entirely, or to drop out of their training programs as soon as their TRA payments end. *See*, *e.g.*, Kletzer & Rosen at 317 n.4 (explaining that "[w]orkers receive [TAA] training only if there are adequate funds available. Most states exhaust training funds . . . well before the end of the [fiscal] year, denying workers the opportunity to enroll in training"); GAO Report 04-1012 at 4, 31-33 (reporting that 19 states discontinued training for TAA-eligible workers due to shortfalls in funding at some point between 2001 and 2003, and that six states already had been forced to do so in 2004 as of the date of GAO's survey); Harper's Magazine at 63 (same); "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 799 n.11 (and sources cited there) (documenting funding shortfalls and waiting lists for TAA training); *Chicago Tribune* (profiling worker who was certified for TAA but denied benefits due to funding shortfall; citing results of GAO study, and noting that, "[i]n many cases, states did not receive enough funding to provide training even for workers deemed eligible").

Under the NAFTA-TAA statute (which was repealed/superseded as part of the TAA Reform Act of 2002), the consequences of botched Labor Department investigations were even more onerous. As a practical matter, any protracted delay in a NAFTA-TAA case could render workers' eventual certification a largely pyrrhic victory.

Generally, a worker must be enrolled in training in order to receive TRA payments covering that period (because, in principle, such payments are intended to help workers cover basic living expenses so that they may engage in training). Under the Labor Department's interpretation of the statute and regulations, the agency may waive the training requirement where certification is delayed (*e.g.*, due to litigation), so that workers may retroactively receive TRA payments for periods even though they were not enrolled in training – *except in NAFTA-TAA cases*.

The Labor Department read the NAFTA-TAA statute as specifically precluding the agency from waiving the training requirement. The effect was to deny the payment of basic TRA benefits under NAFTA-TAA to workers who were not both (1) certified by the Labor Department, and (2) participating in approved training within the 104-week period beginning "with the first week following the week in which the adversely affected worker was most recently totally separated from adversely affected employment." *See generally* 19 U.S.C. §§ 2291(c), 2293(a)(2) (*amended by* § 2291 (Supp. II 2002)); 19 U.S.C. § 2331(d)(3)(A)-(B) (repealed 2002); 20 C.F.R. § 617.11(a)(2)(vii); Former Employees of Tyco Electronics v. U.S. Dep't of Labor, 28 CIT ____, ____, 318 F. Supp. 2d 1354, 1356-58 (2004) ("Tyco III") (*quoting* relevant Labor Department correspondence); GAO Report 04-1012 at 19 n.12 ("The . . . NAFTA-TAA program had a training enrollment deadline and did not allow waivers."). (For a particularly succinct and cogent explanation of this problem, *see* Defendant's Memorandum of Law Regarding Length of Voluntary Remand (May 28, 2004), at 7-9, *filed in* Former Employees of IBM Corp. v. U.S. Sec'y of Labor, Court No. 04-00079.) *But see* Whitin Machine Works, 554 F.2d at 502 (in different context, rejecting proffered interpretation of another provision of TAA statute as "impossible to square with the remedial objectives of the Act"; "We cannot believe that Congress could have intended to deny

____, 277 F. Supp. 2d 1298, 1313 (2003) ("Marathon Ashland II"), *rev'd on other grounds*, 370

F.3d 1375 (Fed. Cir. 2004).  As one lawyer put it, "It's one thing to see delays in cases involving

dumping products on the U.S. market, it's quite another to see delays where people are being denied

basic [TAA] assistance so that they can find jobs."  "Analysis & Perspective," BNA Int'l Trade

Reporter, at 796.

Indeed, as Chevron III emphasized, "as a general principle, the effectiveness of trade

adjustment assistance depends upon its *timeliness*."  Chevron III, 27 CIT at ____, 298 F. Supp. 2d

at 1349 (emphasis added); *see also* Whitin Machine Works, 554 F.2d at 502 (criticizing Labor

Department's "administrative footdragging," and emphasizing that "Congress apparently was

---

any worker his federal benefits solely because of administrative footdragging. . . . The only
conceivable purpose of [the timing requirement there at issue] was to further the Act's remedial
goals by ensuring that there would be no long delays in the distribution of benefits; Congress
apparently was interested not only in granting benefits but also in ensuring that, to the maximum
extent feasible, the benefits were received during the periods in which they were most needed.  It
would be ironic indeed to convert this seemingly remedial provision into one which would have the
effect of denying any benefits to some workers.").

In at least three litigated cases (*i.e.*, Tyco, Oxford Automotive, and Ericsson), displaced
workers suffered through repeated remands of their NAFTA-TAA claims and were eventually
certified by the Labor Department, only to learn that the extended delays attendant to the agency's
incompetence and intransigence had effectively rendered them ineligible for basic benefits.  *See
generally* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 823 n.116 (discussing Tyco).

In those three cases, the workers ultimately succeeded in receiving at least some of those
benefits – but only after more or less browbeating the agency into submission.  *See generally* Tyco
III, 28 CIT at ____, 318 F. Supp. 2d at 1356-58; Hanifin at 11-12 (discussing post-judgment
developments in Court No. 01-00453, noting that "after months of internal Labor Department
debate, a [so-called] 'Tyco Waiver' was issued for [the Oxford Automotive workers]"); Defendant's
Status Report (May 9, 2005) *and* Defendant's [Supplement to] Status Report (May 12, 2005)
(including, as Attachment A thereto, a "Tyco Waiver" letter from the Labor Department, dated May
11, 2005), *filed in* Former Employees of Ericsson, Inc. v. U.S. Sec'y of Labor, Consol. Court No.
02-00809.

interested not only in granting benefits but also in ensuring that, to the maximum extent feasible, *the benefits were received during the periods in which they were most needed*") (emphasis added). *See generally* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 818 (noting that, "by the time a case reaches the [Court of International Trade], . . . it is likely already too late for . . . the workers") (footnotes omitted). Thus, the consequences of Labor Department delays in certification can be profound – sometimes, quite literally, life-or-death:

> There is a very human face on [TAA] cases. Workers who are entitled to trade adjustment assistance benefits but fail to receive them may lose months, or even years, of their lives. And the devastating personal toll of unemployment is well-documented. Anxiety and depression may set in, with the loss of self-esteem, and the stress and strain of financial pressures. Some may seek refuge in drugs or alcohol; and domestic violence is, unfortunately, all too common. *The health of family members is compromised with the cancellation of health insurance*; *prescriptions go unfilled, and medical and dental tests and treatments must be deferred* (*sometimes with life-altering consequences*). And college funds are drained, then homes are lost, as mortgages go unpaid. Often, marriages founder.

*Id*., 27 CIT at _____, 298 F. Supp. 2d at 1349 (emphasis added) (footnote omitted).[64] *Cf.* Cleveland

---

[64]In Oxford Automotive, for example, the Labor Department certified the workers for benefits only after multiple remands, and more than *three full years* after many of them lost their jobs. By that time, workers' lives had already been ravaged by "bankruptcies, divorces, [and] drug abuse." *See* Hanifin at 12.

As pro bono counsel in that case put it, the workers' ultimate victory was therefore "bittersweet": "Because of the passage of time, most of the former . . . plant employees had moved on with their life [by the time the Labor Department finally issued its certification]. A few found better jobs, most did not. . . .Many . . . [had been] forced to use their savings to survive until they obtained a job they could live on." *Id*.

And, unfortunately, Oxford Automotive is no great anomaly. In Chevron, for example, it took the Labor Department *nearly four years* to grant the workers there the relief to which they were entitled. *See* Chevron III, 27 CIT at _____, 298 F. Supp. 2d at 1345. *See also*, *e.g.*, Hawkins Oil & Gas II, 17 CIT at 127, 130-31, 814 F. Supp. at 1113, 1115-16 (*more than three years* after layoffs, and following repeated remands to agency, Labor Department ordered by court to certify workers); "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 806 (noting that multiple remands are a common

Board of Education v. Loudermill, 470 U.S. 532, 548-51 (1985) (Marshall, J., concurring in part) (spelling out the cost – in human terms – of unemployment, in context of discussion of pre-termination due process to which public employees may be entitled).

In the case at bar, at least one of the four representative plaintiff Workers who filed this action still had not found full-time employment more than one full year after his termination at BMC, resulting in "significant hardship for [his] family." In an attempt to make ends meet, he had no choice but to liquidate his retirement account, and his wife was forced to start working. *See* S.A.R. 55. Even so, they count themselves among the lucky few, because at least her job offers health insurance coverage. *Id*. As in Chevron, "[t]he record here – perhaps mercifully – does not reveal the current employment status of . . . [the scores of other displaced BMC] Workers, or how (and with what success) . . . [they] have endeavored to support themselves and their families" since they lost their jobs. *See* Chevron III, 27 CIT at ____, 298 F. Supp. 2d at 1349.

Delay was thus the major concern of the Workers here, from the very inception of this action. *See*, *e.g.*, Plaintiffs' Reply to Defendant's Response to Plaintiffs' Comments on Remand Results, at 2 (noting that "timing was of singular concern to Plaintiffs"). Accordingly, for example, the Workers conditioned their consent to the Government's motion for a voluntary remand on the entry of a detailed order requiring the Labor Department, on remand, "to undertake *a comprehensive review of all issues* relevant to determining whether [the Workers] are eligible for TAA benefits," and mandating that the remand results be filed within 60 days. *See* Plaintiffs' Response to Government's Second Amended Motion to Remand Case at 4 (emphasis added). The Workers were

occurrence in TAA cases).

understandably concerned about the prospect of protracted delays associated with the "ping-pong"

phenomenon, where a case repeatedly bounces back and forth between the Labor Department and

the court as a result of the agency's standard "piecemeal" approach to the investigation of TAA

petitions.[65]

---

[65]*See* Plaintiffs' Response to Government's Second Amended Motion to Remand Case at 2-5:

> Plaintiffs are eager to ensure that, regardless of whether this matter is resolved on remand or is resolved after returning to the CIT, it be remanded only once if at all possible. . . .

> Plaintiffs are concerned that if a negative certification determination is made [on remand], and if that determination is made on the perceived failure to satisfy a single statutory requirement. . . , additional future remands in this proceeding might become more likely.

> This concern stems from that fact that, in response to Plaintiffs' initial petition for benefits, and in response to Plaintiffs' petition for reconsideration for benefits, the only issue the Department reached was that BMC Software was not involved with the production of an "article" . . . . No express determination was made as to whether the other statutory requirements for issuance of benefits had been [met] . . . . Should a similarly narrow conclusion on the 'article' issue be reached on remand but then be reversed by this Court, a second remand to investigate whether the other statutory requirements are satisfied in this case would seemingly be unavoidable.

> Accordingly, Plaintiffs believe that a determination of all statutory elements [for TAA certification] . . . would serve the interests of all parties . . . . Plaintiffs respectfully state that the potential of enduring future remands solely to develop facts that might have been developed in a thorough initial remand is something that should be avoided.

*See also* Letter from Counsel for Plaintiffs to Counsel for Defendant (July 27, 2004) (S.A.R. 26-28) (Workers "are eager to ensure that, regardless of whether this matter is resolved on remand or is resolved after returning to the CIT, it be remanded only once if at all possible"); Former Employees of Chevron Prods. Co. v. U.S. Sec'y of Labor, 27 CIT ____, ____ n.9, 279 F. Supp. 2d 1342, 1355 n.9 (2003) ("Chevron II") (criticizing agency's general "piecemeal" approach to TAA and NAFTA-TAA investigations).

As illustrated by the history of virtually every TAA case filed with the court in recent years,

the Labor Department's standard investigative *modus operandi* appears to be to target whichever element of a TAA claim the agency perceives to be the weakest, and – if the agency finds that that particular element is not satisfied – to deny the claim on that basis, with no investigation or analysis of the other elements of the claim. *See*, *e.g.*, IBM, 29 CIT at ____, 403 F. Supp. 2d at 1345 (finding that Labor Department "aborted its analysis of the [workers'] petition, and did not reach determinations on all applicable criteria for certification"); EDS I, 28 CIT at ____, 350 F. Supp. 2d at 1292  (emphasizing that Labor Department prematurely "aborted" its investigation); Ericsson I, 28 CIT at ____, 2004 WL 2491651 at * 3 (criticizing Labor Department's "truncated investigation," which agency sought to excuse "on the grounds that, 'based on the facts in the case, a full investigation would serve no purpose since workers do not produce an article as required [for TAA eligibility]'").

But the considerations of administrative economy that might typically justify such "cherry-picking" by an agency contemplate that the agency's determinations are the product of thorough, thoughtful consideration.  And, as discussed above, the Court of International Trade has found – in case after case – that the Labor Department's TAA determinations are anything but. *See generally* n.10 (summarizing various recent opinions criticizing Labor Department's handling of TAA cases).

Also weighing heavily *in favor of* comprehensive TAA investigations (*i.e.*, agency investigations that address all elements of a claim) and *against* serial remands (both voluntary and court-ordered) is the remedial nature of the TAA statute. *See*, *e.g.*, UAW v. Marshall, 584 F.2d at 396 (noting the "general remedial purpose" of TAA statute); Fortin v. Marshall, 608 F.2d at 529 (same); Whitin Machine Works, 554 F.2d at 500, 502 (same).

Indeed, the appellate courts have emphasized that Congress "clearly desired the expeditious treatment of [TAA] petitions," weighing in against "administrative footdragging" and interpreting the TAA statute "to further the [statute's] remedial goals by ensuring that there would be no long delays in the distribution of benefits." *See*, *e.g.*, Whitin Machine Works, 554 F.2d at 501-02, 504. As one Court of Appeals has explained:

> Congress apparently was interested not only in granting benefits but also in *ensuring that*, to the maximum extent feasible, *the benefits were received during the periods in which they were most needed.*

*See generally id*. at 502 (emphasis added).

In an effort to limit the number of remands required to reach a sustainable agency determination, frustrated courts and plaintiff workers have increasingly sought to use exquisitely detailed remand orders to structure agency investigations on remand, to ensure that all elements of a claim are adequately investigated. *See*, *e.g.*, Remand Order (Aug. 11, 2004); Ericsson I, 28 CIT at ____, 2004 WL 2491651 at * 7. *But see* Former Employees of Quality Fabricating, Inc. v. U.S.

Among other things, the Workers voiced concerns that the time consumed by the litigation process would itself "dimin[ish] . . . the benefits [they could] expect to receive should they ultimately prevail." *See* Plaintiffs' Response to Government's Second Amended Motion to Remand Case at 2.[66] In later seeking an extension of time of an additional 60 days to file the results of the voluntary remand, the Government induced the Workers' consent to the requested extension of time – and the Court's entry of an order granting that extension – with express, unequivocal assurances that "in the event petitioners are certified in this case, the petitioners would be entitled to receive full TRA benefits regardless of the date they are certified." *See* Defendant's Consent Motion for an Extension of Time to File Remand Results, at 3-4; *see also* Letter from Counsel for Plaintiffs to the

---

Sec'y of Labor, 448 F.3d 1351, 1357 (Fed. Cir. 2006) (noting that Court of International Trade "has no authority to 'grant an injunction or issue a writ of mandamus in any civil action commenced to review a final determination of the Secretary of Labor,'" but finding it unnecessary – under the circumstances of that case – to reach "the question of whether there is any basis [for sustaining] . . . the Order of the Court directed to the Secretary," where trial court's Order, *inter alia*, "directed Labor to take specific steps to notify the employees, and report back with status updates," and sought "to reach federal government agencies and resources beyond Labor by directing utilization of all available 'government resources' to locate and provide notice to affected employees."); *compare* UAW v. Brock, 816 F.2d at 768 (acknowledging District Court's authority over nonparty state agencies, as "a function of the [Labor] Secretary's authority over those agencies").

[66]*See also* Letter from Counsel for Plaintiffs to the Court (Feb. 11, 2005) (Workers "concerned with any adverse impact on [their] receipt of benefits" associated with litigation delays; "should they prevail, [Workers] [s]hould not be prejudiced" by time consumed by litigation; "[Workers] are entitled to a full period of benefits, unencumbered by the delays associated with administrative review and litigation in this matter"); Plaintiffs' Reply to Defendant's Response to Plaintiffs' Comments on Remand Results, at 2 (Labor Department "should not now deny [Workers] any benefits to which they would otherwise be entitled but for the passage of time due to the instant litigation"), 4 (litigation should not be allowed "to extinguish a portion of [Workers'] benefits"; Workers should receive "the full measure of benefits [they] would have been able to receive if the Department [of Labor] had properly certified them for benefits in the first instance").

Court (Feb. 11, 2005) ("Given the Government's representation, Plaintiffs consented to an extension of time, expressly predicated on their belief that, should they prevail, they would not be prejudiced as a result of [that extension]").

The Workers therefore expressed dismay that the Labor Department's Revised Remand Determination makes no reference to the assurances given earlier by the Government. The Workers have urged the Court to "expressly order[ ], in accordance with Defendant's representation, that Plaintiffs, having been certified, are entitled to receive full TRA benefits, regardless of the date of their certification." *See* Plaintiffs' Comments on Defendant's Determination on Remand, at 1-2. For its part, the Government responded with the (admittedly sophisticated and measured) legal equivalent of the playground taunt, "MYOB" ("Mind Your Own Business"). Specifically, the Government maintains that the Court lacks jurisdiction to grant the Workers' request:

> [A]lthough the Court may sustain a determination or remand the case to Labor for further fact finding or explanation, no provision [in 19 U.S.C. § 2395] allows the trial court to specify the level of benefits to which a certified petitioner may be eligible. Accordingly, although Labor confirms that the delay from litigation will not affect the calculation of benefits . . . , the Court lacks the authority to dictate whether the petitioners will, in fact, receive "full" TRA benefits . . . .

[Defendant's] Response to Plaintiffs' Comments In Response to Labor's Remand Determination, at 3. *See* Defendant's Memorandum of Law in Response to the May 12, 2005 Order, at 3 (characterizing as "inappropriate" the Court's inquiry into the effects, if any, of litigation delays on relief ultimately available in a TAA case).[67]

---

[67]*See also* Defendant's Memorandum of Law In Response to the February 4, 2005 Order, at 1 ("the Court lacks the authority to dictate whether the petitioners will, in fact, receive 'full' TRA benefits"), 2 ("any order declaring that the petitioners would be 'entitled' to 'full' TRA benefits . . . would impermissibly exceed this Court's limited authority to review Labor's determination of eligibility"), 4 ("[a]lthough the Court may . . . remand the case to Labor . . . , no provision in [the

statute] allows the Court to specify the level of benefits [for] which a certified petitioner may be eligible.  Thus, the Court lacks jurisdiction to review the calculation of benefits.").

The Government has advanced the same argument in other TAA and NAFTA-TAA cases as well.  For example, in Ericsson, the Government argued:

> Although the Court may sustain a determination or remand the case to Labor for further fact finding or explanation, no provision in [19 U.S.C. § 2395] allows the Court to specify the level of benefits to which a certified petitioner may be eligible.  Thus, the Court lacks jurisdiction to review the calculation of benefits.
>
> Determinations with respect to calculation of benefits are generally reviewable by *state courts* in accordance with *state law*.

[Defendant's] Status Report (May 9, 2005) at 4-5, *filed in* Former Employees of Ericsson, Inc. v. U.S. Sec'y of Labor, Court No. 02-00809; *see also* [Defendant's Supplemental] Status Report (May 12, 2005) at 1-2 ("the state's calculation and issuance of benefits are not matters properly before this Court"; "any dispute with state officials regarding distribution of benefits should be handled by state courts").  Similarly, in Tyco, the Proposed Judgment Order proffered by the Government stated:

> Because the Revised Remand Determination is supported by substantial evidence and otherwise in accordance with law, the Court does not reach the question of whether it possesses jurisdiction to entertain claims against certain state agencies that are entrusted to administer the distribution of NAFTA-TAA benefits . . . .  Likewise, the Court need not address whether the grant of "jurisdiction to affirm the action of the Secretary of Labor . . . or set aside such action" pursuant to 19 U.S.C. § 2395(c), operates as a grant of jurisdiction for this Court to direct the United States Department of Labor to direct a state agency to administer its benefits in a certain way.

Proposed Judgment Order at 8-9 (submitted under cover of [Defendant's] Notice of Filing, dated March 19, 2004), *filed in* Former Employees of Tyco Electronics v. U.S. Dep't of Labor, Court No. 02-00152.  And, in Former Employees of Quality Fabricating, Inc. v. U.S. Dep't of Labor, Court No. 02-00522, *see* [Plaintiffs'] Status Report Concerning Draft Proposed Order, at 2 (reporting Government's objection to paragraph in proposed order on grounds that "it sought to order an action that was outside the Court's jurisdiction, *i.e.*, that it ordered the specific award of benefits to Plaintiffs"), as well as [Defendant's] Motion for Stay Pending Possible Appeal (July 11, 2005) at 10-11 (asserting that "the Court lacks jurisdiction concerning the benefit claims of individual workers.  Rather, such claims belong in state court.").  *See also* McCarthy at 7-8 (arguing that, "[g]iven the changing fora for judicial review of specific certification determinations over the years, it makes sense to construe narrowly the jurisdictional grant to the Court of International Trade in

It is, of course, true that the statutory scheme generally vests the state courts with jurisdiction over disputes concerning the specific TAA benefits to which individual members of a certified group of former employees are entitled. *See* 19 U.S.C. § 2311(d); UAW v. Brock, 477 U.S. 274, 285 (1986). But 19 U.S.C. § 2311(d) is not the forbidding, impenetrable citadel that the Government seeks to depict. *See*, *e.g.*, UAW v. Brock, 816 F.2d 761, 768 (D.C. Cir. 1987); Hampe v. Butler, 364

---

the area of trade adjustment assistance").

The jurisdictional arguments discussed above can be viewed in the context of other, similar challenges in recent years. In one line of cases, for example, the Government has appealed court-ordered TAA certifications of workers, arguing that such action is beyond the statutory authority of the Court of International Trade – notwithstanding the Labor Department's decade-plus prior history of acquiescing in the remedy. *Compare* Marathon Ashland, 370 F.3d at 1385-86, *and* Barry Callebaut, 357 F.3d at 1381-83, *with* Pittsburgh Logistics II, 27 CIT at ____, 2003 WL 22020510 at * 15 ("Labor shall certify the plaintiffs as eligible for trade adjustment assistance benefits forthwith"); Hawkins Oil & Gas II, 17 CIT at 131, 814 F. Supp. at 1115-16 ("the Secretary of Labor shall certify plaintiff as eligible for trade adjustment assistance"); *and* United Electrical, Radio and Machine Workers of America v. Martin, 15 CIT 299, 308-09 (1991) ("the Secretary of the United States Department of Labor shall certify petitioners as eligible to receive trade adjustment assistance").

To date, the Court of Appeals has side-stepped the Government's challenge. *See* Marathon Ashland, 370 F.3d at 1386 (under the circumstances, finding "no occasion to address the government's argument that the remedy ordered by the [Court of International Trade] was outside [its] authority"); Barry Callebaut, 357 F.3d at 1383 (deeming "moot" "the question of the Court of International Trade's authority to order Labor to certify [workers]" for TAA benefits). Indeed, the workers in Barry Callebaut specifically cautioned the Court of Appeals against writing the Labor Department a "blank check": "If Labor were correct that the Court of International Trade could do nothing other than affirm or remand, . . . the court would be powerless to do anything more than order a potentially endless series of futile remands, no matter how many times Labor failed to perform an adequate investigation" – "an 'absurd result'." 357 F.3d at 1382-83. *Cf.* Nippon Steel Corp. v. United States, ____ F.3d ____, ____, 2006 WL 2290991 at * 12 (Fed. Cir. 2006) (pointedly declining to endorse Government's claim that 19 U.S.C. § 1516a precludes Court of International Trade from reversing agency determinations in international trade cases and allows Court only to affirm or remand; emphasizing that "[i]t may well be that, in another situation, the trade court may be faced with [an agency] determination that is unsupported by substantial evidence, and for which a remand would be 'futile.'").

F.3d 90, 93 (3d Cir. 2004).[68]

_____

[68]On remand, following the Supreme Court's opinion in UAW v. Brock, 477 U.S. 274, the Court of Appeals for the D.C. Circuit acknowledged that the District Court had authority over nonparty state agencies, albeit as "a function of the [Labor] Secretary's authority over those agencies." UAW v. Brock, 816 F.2d at 768. Thus, the Court of Appeals held, "as the states administer the TRA program as 'agents' of the United States, . . . *the District Court's order requiring the Secretary to modify certain directives to the state agencies was entirely appropriate*." *Id*. (emphasis added). Moreover, the D.C. Circuit echoed the Supreme Court's sentiment as to the ultimate effect of the District Court's order to the Labor Department: "[w]e have little doubt that the state agencies . . . would obey the Secretary's directive . . ." *Id*. (*quoting* 477 U.S. at 292).

Hampe v. Butler recently reaffirmed the continuing vitality of the D.C. Circuit's opinion in UAW v. Brock. Conceding that the federal courts "cannot hear *direct requests* for redetermination" of individual claims for TAA benefits, the Court of Appeals for the Third Circuit nevertheless firmly rejected the Government's argument that the relegation to *state courts* of jurisdiction to hear individual redetermination claims under 19 U.S.C. § 2311(d) deprives *federal courts* of jurisdiction to hear statutory claims that may "influence the outcomes of redetermination proceedings." Hampe v. Butler, 364 F.3d at 93 (emphasis added) (*cited for another proposition with approval in* Former Employees of Quality Fabricating, Inc. v. U.S. Dep't of Labor, 448 F.3d at 1352). *See generally* "Third Circuit Says DOL Must Order State to Reconsider Job Training Travel Costs," U.S. Law Week, April 20, 2004, at 1628-29 (discussing Hampe v. Butler).

*See also* 28 U.S.C. § 1367(a) (authorizing district courts' exercise of "supplemental jurisdiction" to entertain claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"); United States v. Hanover Ins. Co., 18 CIT 991, 992-93, 869 F. Supp. 950, 952 (1994) (holding that § 1367(a) extends to Court of International Trade under 28 U.S.C. § 1585, which grants that court "all the powers in law and equity of, or as conferred by statute upon, a district court"), *aff'd*, 82 F.3d 1052 (Fed. Cir. 1996); B-West Imports, Inc. v. United States, 19 CIT 303, 315 n.15, 880 F. Supp. 853, 864 n.15 (1995), *aff'd*, 75 F.3d 633 (Fed. Cir. 1996); Associacao dos Industriais de Cordoaria e Redes v. United States, 17 CIT 754, 763 n.16, 828 F. Supp. 978, 988 n.16 (1993). *Cf*. Heartland By-Products, Inc. v. United States, 424 F.3d 1244 (Fed. Cir. 2005) (notwithstanding its dismissal of an action, under doctrine of ancillary enforcement jurisdiction, Court of International Trade retained inherent power – pursuant to 28 U.S.C. § 1585 – to determine effect of, and ensure compliance with, its ruling); Former Employees of Southern Triangle Oil Co. v. U.S. Sec'y of Labor, 14 CIT 100, 105-07, 731 F. Supp. 517, 521-23 (1990), *vacated and remanded on other grounds*, 925 F.2d 1479 (Fed. Cir. 1991) (rejecting Government's argument that Court of International Trade lacked jurisdiction, where state authority's refusal to award TAA benefits to individual worker was due to "the terms of the Labor Department's certification," which were not in accordance with law).

Even assuming *arguendo* that the court – in a run-of-the-mill TAA case – lacks the authority to "expressly order[ ], . . . that Plaintiffs, having been certified, are entitled to receive full TRA benefits, regardless of the date of their certification," it is clear beyond cavil that "a court always retains jurisdiction to supervise and administer its own docket." Arvinmeritor, Inc. v. United States, 29 CIT ____, ____, 2005 WL 1958804 at * 1 (2005). *See also*, *e.g.*, Landis v. North American Co., 299 U.S. 248, 254-55 (1936) (invoking "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants," involving "the exercise of judgment" on the part of the court); L.E.A. Dynatech, Inc. v. Allina, 49 F.3d 1527, 1530 (Fed. Cir. 1995) (same).

Thus, to the extent that the time consumed by litigation may operate in any fashion to limit the effectiveness of any relief that may ultimately be awarded in a TAA case, the court is duty-bound – particularly in light of the remedial nature of the TAA statute – to expedite its proceedings, limiting the number and the duration of remands, and otherwise keeping the parties (particularly the Labor Department) on a short leash.[69] To the extent that litigation delays may operate to limit the effectiveness of any relief that may ultimately be awarded in a TAA case, the judges of the Court of International Trade have a clear and legitimate interest in the matter – and inquiries on the topic

In short, the division of jurisdiction between the state courts and the federal courts in TAA-related cases is considerably more nuanced than the Government has, from time to time, suggested.

[69]The Government's argument has a particularly hollow ring given its failure in cases such as Tyco, Oxford Automotive, and Ericsson to affirmatively alert the court and all parties in advance to the potentially devastating effect of litigation delays on the benefits ultimately awarded in those NAFTA-TAA proceedings. *See* n.63, *supra*.

are in no way "inappropriate."[70]  *Cf.* Whitin Machine Works, 554 F.2d at 502 (rejecting proffered interpretation of provision of TAA statute as "impossible to square with the remedial objectives of the Act," and emphasizing that Congress could not have "intended to deny any worker his federal benefits solely because of administrative footdragging"; "remedial goals" of TAA statute are furthered "by ensuring that there [are] no long delays in the distribution of benefits"; "Congress apparently was interested not only in granting benefits but also in ensuring that, to the maximum extent feasible, the benefits were received during the periods in which they were most needed.").

Finally, without regard to any authority the Court may (or may not) have, in the abstract, to order that a group of petitioners are "entitled to receive full TRA benefits, regardless of the date of their certification," there is nothing whatsoever that is abstract or hypothetical about the circumstances of the case at bar.  To the contrary, in its Motion for an Extension of Time to File Remand Results, the Government here stated flatly and unequivocally that, "in the event petitioners are certified in this case, *the petitioners would be entitled to receive full TRA benefits* regardless of the date they are certified."  (Emphasis added.)  Thus, as the Workers have correctly observed, the issue presented in this case "is whether this Court should exercise its inherent authority to give effect to a representation made by the Government in a pleading before this Court."  Plaintiffs' Reply to Defendant's Response to Plaintiffs' Comments on Remand Results, at 2.  The Workers emphasize:

> Plaintiffs . . . have a reasonable expectation as litigants to have a measure of reliability in their dealings with the government in this case [– as does the Court – ]. . . . The Government should not have assured Plaintiffs of their entitlement to full

---

[70]*See* Defendant's Memorandum of Law in Response to the May 12, 2005 Order, at 3 ("[I]t is inappropriate for the Court to inquire into matters beyond its jurisdiction.  To the extent that any petitioners experience perceived difficulties in the receipt of benefits after certification has issued, any such grievance would be a matter for state courts.").

benefits if the Government knew it would ultimately take the position that its representation (designed to induce an extension [of time]) could not be enforced. *In such a scenario, the Court must have the authority to hold the Government to its words*.

*Id*. (emphasis added). Surely the Government does not contend that the Court is powerless to hold the Government to its word, or that petitioning workers are relegated to the state courts to enforce express representations made by the Government to petitioning workers and to the Court of International Trade, and on which the workers and the Court have relied.

In any event, the Workers subsequently advised that – armed with Defendant's Memorandum of Law in Response to the May 12, 2005 Order (which confirms, *inter alia*, that the absolute value of benefits available to a certified worker does not vary based on when the worker was certified, and that, if necessary, a full 52 weeks of Basic TRA benefits can be paid entirely retroactively when certification is greatly delayed) – they no longer foresaw any insurmountable obstacles to their receipt of the full measure of TAA benefits.[71] *See* Letter from Counsel for Plaintiffs to the Court

---

[71]For analyses confirming that delays attendant to TAA litigation do not prejudice any rights that workers may have to a full measure of Basic TRA benefits, *see* Defendant's Memorandum of Law in Response to the May 12, 2005 Order, at 3 ("confirm[ing] that Labor construes the language of 19 U.S.C. § 2293(a)(2) as limiting only the period of unemployment for which basic TRA benefits may be paid – not as restricting in any way when those benefits maybe paid, and not as precluding the payment of a full 52 weeks of TRA benefits entirely retroactively (*i.e.*, even when certification occurs well after the entire 104-week period has expired)") (*citing* Guidance Letter issued by Labor Department, included as Att. A to [Defendant's] Status Report (May 12, 2005), *filed in* Former Employees of Ericsson, Inc. v. U.S. Sec'y of Labor, Court No. 02-00809, *and* Memorandum of Law (May 28, 2004), *filed in* Former Employees of IBM Corp. v. U.S. Sec'y of Labor, Court No. 04-00079 (explaining that, where certification occurs after statutory 104-week period has elapsed due to litigation delay, state agencies will make lump sum payments based on the total number of weeks of unemployment categorized as basic TRA during this period in which the worker otherwise met the eligibility criteria)).

*See also* Letter from the Court to Counsel (May 12, 2005); Defendant's Memorandum of Law in Response to the February 4, 2005 Order, at 2-3; Letter from the Court to Counsel (Feb. 4,

(May 19, 2005) (detailing the many challenges the Workers encountered in obtaining their TAA

benefits from Texas Workforce Commission).[72]  The Workers further advised that if – contrary to

their expectations – they did in fact continue to experience problems with their receipt of benefits,

they would promptly notify the Court.  *Id.*  The Workers' silence in the intervening months suggests

that any need for further proceedings to "hold the Government to its words" has been obviated.

More generally, routine requests for voluntary remands cannot be justified on the grounds

that there are only "[a] minority of [TAA] cases in which a negative determination is challenged in

the Court of International Trade."[73]   While it is true that only a tiny fraction of the

---

2005), at 1-3; [Defendant's] Response to Plaintiffs' Comments in Response to Labor's Remand Determination, at 2-3; Defendant's Consent Motion For an Extension of Time to File Remand Results, at 3-4; Letter from the Court to Counsel (Aug. 11, 2004).

For analyses confirming that the time consumed by TAA litigation does not prejudice any rights that workers may have to a full measure of Additional TRA benefits, *see* Defendant's Memorandum of Law in Response to the February 4, 2005 Order, at 3-4; Letter from the Court to Counsel (Feb. 4, 2005), at 3-4.

[72]The Workers' *pro bono* counsel are to be credited for assisting with the Workers' pursuit of their individual claims for TAA benefits at the state level.  In this case, as in many others, navigating the bureaucracy of the Labor Department is merely the first step for petitioning workers.  Certification by the Labor Department can be an illusory remedy.

[73]*See* McCarthy at 14 ("Given the context of . . . Labor's administration of the [TAA] program, in which many petitions are certified as eligible following investigation, it is not unreasonable for Labor to conduct further investigation in the minority of cases in which a negative determination is challenged in the Court of International Trade.").

According to an October 2005 article in the *Chicago Tribune*, "[t]he Labor Department denies 40 percent of the [TAA] petitions" it receives.  *See also*  Harper's Magazine at 63 ("[a]bout one third of all TAA petitions the Labor Department receives it denies outright"); "Analysis and Perspective," BNA Int'l Trade Reporter at 797 (same).

Research has identified no study analyzing those cases in which the Labor Department's initial investigation results in certification *versus* those in which certification is denied.

agency's denials are ever appealed to this court, that fact provides no logical support for the notion

that routine agency requests for voluntary remands should be condoned as "business as usual."

---

       For example, is there a correlation between the extent of the resources that the agency devotes to a particular investigation and the Labor Department's determination in that case (granting or denying the petition)? Does the outcome depend on the individual investigator to whom a particular petition is assigned? Do some investigators consistently conduct more thorough investigations than other investigators? Is there a correlation between the extent of the investigation and the outcome? (In other words, is a thorough investigation more likely to lead to certification than to denial?) Are petitions granted much more frequently in some industries than in others (and, if so, why)? Are petitions involving greater numbers of displaced workers more (or less) likely to be granted? Are petitions more likely to succeed if the Labor Department has previously granted a prior petition filed by other workers from the same company? Similarly, if the Labor Department has previously denied a related prior petition, does a petition get shorter shrift, and is it more likely to be denied? Do petitions filed by an employer or by a union stand a greater chance of success than those filed by *ad hoc* groups of individual workers? Are petitions from some regions of the country more likely to succeed than others? Does it make a difference whether the petitioners are represented by counsel at the agency level? Is a petition more likely to be granted if the case has had a high profile in the media, or if the Labor Department has been on the receiving end of expressions of Congressional interest? (*Cf.* <u>Murincsak v. Derwinski</u>, 2 Vet. App. 363, 372 (1992) (*citing* correspondence between claimant veteran and U.S. Senator, and between U.S. Senator and Secretary for Veterans Affairs).) Are petitions filed with the assistance of state or local employment offices more likely to succeed? (*Cf.* GAO Report 93-36 at 3, 7-8 (noting correlation between number of TAA petitions filed from particular states and the relative level of assistance in filing of petitions that those states provide to interested workers).) What *are* the determinative factors – and are they proper?

       As section I.A above explains, the TAA statutes are remedial legislation. For that reason, and "[b]ecause of the *ex parte* nature of the . . . process," the Labor Department is obligated by law to conduct rigorous investigations of *all* petitions filed with the agency, "with the utmost regard for the interest of the petitioning workers." <u>Int'l Molders and Allied Workers' Union</u>, 643 F.2d at 31. *See also* <u>Stidham</u>, 11 CIT at 551, 669 F. Supp. at 435 (citation omitted). Thus:

> *It would be wholly inconsistent with Congress' intent if* the trade adjustment assistance programs were to become little more than "claims mills," where all but the most well-documented and patently meritorious claims were denied at the agency level, and *thorough investigations were largely reserved for those few cases which were appealed to the courts*.

<u>Ameriphone</u>, 27 CIT at ____ n.9, 288 F. Supp. 2d at 1359 n.9 (emphasis added).

Indeed, the Labor Department would be wrong to tout the relatively low number of denials appealed to the court as any sort of meaningful measure of the integrity of the agency's administrative process. It is unlikely that many of the workers who fail to appeal intend to confer their imprimatur on the agency's handling of their cases.[74] The reality is that workers who find themselves unemployed are often traumatized, and – at least initially – experience great emotional turmoil, and are overwhelmed by unemployment-related uncertainties in their financial and personal lives.[75] As a result, relatively few of those who might otherwise be expected to apply for benefits actually manage to summon up the energy to file a timely TAA petition. And the vast majority of

---

[74]*See*, *e.g.*, GAO Report 93-36 at 7 ("Despite flaws in Labor's investigations, few determinations are appealed. . . . Although 65 percent of the 92 denied petitions in [GAO's] sample had flawed investigations, in only 19 cases did petitioners request that Labor reconsider its decision and in only 3 did petitioners appeal Labor's decision to the Court of International Trade."); "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 805 n.39 (*citing* 1992 GAO Report) ("Most workers whose [TAA] claims are denied never seek [judicial] review.").

[75]*See*, *e.g.*, GAO/T-HRD-94-4, "Dislocated Workers: Trade Adjustment Assistance Program Flawed," Oct. 1993, at 5 ("GAO Report 94-4") (explaining that "dislocated workers often need ongoing monitoring, encouragement and various forms of emotional support to help them cope with financial as well as personal problems . . . [E]*motional turmoil* [is] felt by those who lose their jobs, including *depression* and *a questioning of their skills and competencies*. . . . [P]roviding assistance to reduce *anxiety* and *help dislocated workers cope* with their problems is an essential component of successful dislocated worker projects") (emphases added) (citation omitted); GAO Report 04-1012 at 3 (emphasizing that unemployed workers need time "to process the *trauma* of losing their jobs and to accept the need for training or other services"), 17 (noting that "it often takes time for dislocated workers to process the *emotional shock* of being laid off") (emphases added).

*See also* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 819 (noting that many displaced workers "lack the time, resources, . . . [and] educational background necessary to complete the [TAA] petition[ ] in a completely responsive manner") & n.100 (*citing* GAO data showing that approximately 80% of petitioning workers "have not gone past high school in their education" and that 20% are not proficient in English).

those who do are *pro se*.[76]

It should therefore come as no surprise that, when their TAA petitions are denied, only a mere handful of workers persevere and pursue their claims into court – whether due to resignation, sheer fatigue and diminishing emotional stamina, the press of other urgent priorities, the intimidating prospect of navigating the litigation process as a lay person, or even a blind faith in the Labor Department and an all-too-often unwarranted assumption that the agency properly discharged its duties. *See generally* Ameriphone, 27 CIT at _____ n.9, 288 F. Supp. 2d at 1359 n.9 (noting that "for various reasons (including, for example, a blind faith in the Labor Department and its discharge of its duties), the vast majority of workers whose petitions are denied never challenge the agency's determinations in court").

In sum, it would be a serious mistake to read much of anything into the relatively low number of denials of TAA petitions that are challenged in court. What *is* telling is the Labor Department's track record on appeal.

### E.  The Labor Department's Overall "Track Record" Before the Court

An analysis of the TAA cases filed with the Court in the four-year period from 2002 through 2005[77] reveals that, of the 45 TAA cases litigated to resolution on the merits,[78] the Labor Department

---

[76]*See*, *e.g.*, McCarthy at 15 (acknowledging that, in TAA cases, "[t]he petitioners are usually unrepresented by counsel" in proceedings before the agency).

[77]The analysis includes both NAFTA-TAA cases and TAA cases, as well as Alternative TAA ("ATAA") cases. It does not include Agricultural TAA cases, because those cases are not handled by the Labor Department.

[78]By definition, this figure does not include cases that were dismissed for lack of jurisdiction or for failure to prosecute, or that were voluntarily dismissed by the plaintiff workers. Nor does it

ultimately certified the workers in all but four cases.  In other words, the Labor Department's denials

were sustained by the court in a mere four out of 45 cases.  And, even in those four cases, the denials

were sustained only *after* the agency had the benefit of one or more remands to bolster the

investigative record.[79]  Thus, at least during the four-year period of review, the Labor Department

*never even once* successfully defended a denial of TAA certification solely on the strength of the

agency's initial investigation.[80]

Those statistics alone are sobering enough.  But there is even more here than meets the eye.

The fact is that the TAA cases filed with this court almost certainly are just the tip of the iceberg.

Unlike petitioning workers in TAA cases, litigants in most other cases before federal courts

include the five TAA cases filed in 2004 and the six filed in 2005 that remain pending as of this date.

[79]Moreover, the Labor Department's recent change of position on the definition of "article" for TAA purposes vis-a-vis software and other "intangibles" casts doubt on the result in at least some of the four cases.  *See*, *e.g.*, Former Employees of Mellon Bank, N.A. v. U.S. Sec'y of Labor, Court No. 03-00374 (petitioning workers who "designed and developed computer software applications . . . to provide financial services to [bank] customers" denied certification, where Labor Department reasoned that "informational products that could historically be sent in letter form and that can currently be electronically transmitted" are not "articles" for purposes of TAA, and the "the design and development of . . . software itself" does not constitute "production"); Former Employees of Sun Apparel of Texas v. U.S. Sec'y of Labor, Court No. 03-00625 (petitioning garment workers denied certification where Labor Department's determined that "patterns and markers" produced by workers "were created by using special computer programs," "were neither stored nor transmitted in a physical medium, but existed in an electronic form (such as a file on a computer server or an electronic mail)," "were electronically manipulated," and "were sent exclusively via electronic mail").

[80]"According to an analysis [by the Bureau of National Affairs of opinions issued between 2001 and early May 2004] , . . . the [Court of International Trade] affirmed the Labor Department's denial of TAA certification in only five of the forty-one cases it ruled on during roughly the same time." *See* Harper's Magazine at 63; "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 806 (BNA "study of three years of decisions found that the [Court of International Trade] upheld only 12.5% of [the Labor Department's] denials of certifications of eligibility").

and agencies are represented by counsel, who perform what is essentially a screening function by advising their clients whether a particular case is worth litigating, and – if the case is lost at the initial  level – whether an appeal is worth the nickel.  Not so in TAA cases.  Because the vast majority of the workers who file TAA petitions with the Labor Department are *pro se*, they lack access to the legal expertise that would enable them to make informed judgments – particularly in light of the complex and nuanced statutory and regulatory scheme – about the relative merits of their claims.

In TAA cases, there generally are no lawyers separating the wheat from the chaff, advising petitioning workers to pursue in court only those cases with the greatest likelihood of success.  It is, therefore, reasonable to assume that the TAA petitions which are *denied but not appealed* to the court are – on the whole – no less meritorious than the denied petitions which *are* challenged here.  Extrapolating workers' roughly 90% "rate of success" before the court to the hundreds of TAA petitions that are denied but not appealed every year suggests that the Labor Department's failure to properly investigate petitions is routinely depriving thousands of U.S. workers of the TAA benefits to which they are legally entitled.[81]  The Labor Department should be haunted by that fact.

---

[81]*See generally* Ameriphone, 27 CIT at _____ n.9, 288 F. Supp. 2d at 1359 n.9 (noting that, because relatively few denials are challenged in court, "the claims of many workers may *never* have been the subject of thorough investigation; and, obviously, some percentage of those claims were meritorious."); "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 805 n.39 (same).

This analysis understates the full magnitude of the situation, because it considers only the problems in the Labor Department's handling of those TAA petitions that are actually filed with the agency.  This analysis thus takes no account of the untold numbers of workers who never even apply for TAA benefits – a phenomenon which commentators attribute to, *inter alia*, the agency's failure to conduct outreach and adequately publicize the TAA program.  *See*, *e.g.*, Kletzer & Rosen at 324 ("Over the last 40 years, the DOL has performed very limited public outreach to inform employers, workers, and communities of the existence of TAA."), 328 (citing 2004 GAO report which found

### III. **Conclusion**

The TAA system is fundamentally broken, as evidenced by a number of key indicators –

particularly the relatively high number of requests for voluntary remands in cases that are appealed

to the court, and the extraordinarily high percentage of cases in which the agency reverses itself on

appeal.  Those statistics are a scathing indictment of the Labor Department's administration of the

TAA program.

In short, "[t]here is something fundamentally wrong with the administration of the nation's

trade adjustment assistance programs if, as a practical matter, workers often must appeal their cases

to the courts to secure the thorough investigation that the Labor Department is obligated to conduct

by law."  Ameriphone, 27 CIT at ____, 288 F. Supp. 2d at 1359 (footnote omitted).  Moreover, the

relatively high number of requests for voluntary remands in TAA cases indicates that even the

Government recognizes that the Labor Department is "routinely failing to 'conduct [its]

investigation with the utmost regard for the interests of the petitioning workers' and to 'marshal all

relevant facts' before making its determinations."  *See* Ameriphone, 27 CIT at ____, 288 F. Supp.

2d at 1359 (*quoting* Stidham, 11 CIT at 551, 669 F. Supp. at 435; 29 C.F.R. § 90.12).

To be sure, the statute does not entitle every petitioning worker to be certified as eligible to

apply for TAA benefits.  *See generally* United Glass and Ceramic Workers, 584 F.2d at 400 & n.7,

407.  But every worker *is* entitled to a thorough agency investigation of his or her claim – without

_____

that "many workers are unaware of TAA and that they are eligible to receive assistance under the program. . . .  The DOL has not to date performed any major outreach – for example, using television and radio – to publicize the program. . . . [M]ore resources need to be devoted to informing workers about TAA and other forms of assistance for dislocated workers.").

being forced to resort to the courts.  The law mandates no less.  Ameriphone, 27 CIT at ____, 288 F. Supp. 2d at 1359-60; 29 C.F.R. § 90.12.[82]

In this respect,  the issue is not whether the Labor Department's determination in a particular case is *eventually* upheld; rather, the issue is the adequacy of the *initial investigation at the agency level*.  The Labor Department's need to request a voluntary remand when a case is appealed to the courts is, in essence, a confession of error on the part of the agency.[83]  And, when a remand is required, the agency is not vindicated simply because the ultimate result may not change – although, as discussed in section II.E above, in a stunning percentage of cases, the result in fact *does* change. That fact alone casts a long shadow over the hundreds of negative determinations that the Labor Department issues each year but which never find their way into court.

As the nation prepares to mark yet another Labor Day in tribute to hardworking men and women all across the country, and as Congress and the Executive Branch look toward next year's debate on the renewal of Trade Promotion Authority for the President, it is well to remember that TAA is designed to be a "hand up," not a "hand out."[84]  The very purpose of the TAA program is

---

[82]*Cf*. UAW v. Marshall, 584 F.2d at 397-98 (remanding case to Labor Department, emphasizing that "[e]ven if a more detailed inquiry does not change the result in this case, the class of those seeking or considering adjustment assistance will be afforded (1) a description of the circumstances that the [agency] believes mandate the choice of the plant as the appropriate subdivision and (2) an explanation why [the agency] holds that opinion.").

[83]As Chevron III observed:  "The relatively high number of requests for voluntary remands [in TAA cases] . . . speaks volumes about the calibre of the Labor Department's investigations in general, and the Government's ability to defend [those investigations]" on appeal.  Chevron III, 27 CIT at ____, 298 F. Supp. 2d at 1348.

[84]A recent *Wall Street Journal* article made the point that the TAA program must have teeth if it is to be anything more than a salve for the consciences of proponents of free trade:

to provide retraining and other employment assistance to U.S. workers whose jobs have been sacrificed – in the national interest, and for the greater good of the country – on the altar of free trade. As one scholar recently put it, "Trade is a little bit like war. . . . Fighting World War II [was] a good thing. It[] [was] good for the world, and . . . good for the United States. But for the people who got killed, it was clearly bad. That's what trade is like." Harper's Magazine at 62 (*quoting* Professor Robert LaLonde of the University of Chicago).

The analogy is an apt one. And, much as Congress has charged the U.S. Department of Veterans Affairs (formerly the "Veterans Administration") ("VA") with caring for those who have risked life and limb for our freedom,[85] so too Congress has entrusted to the Labor Department the responsibility for providing training and other re-employment assistance to those who have paid for our place in the global economy with their jobs. *Compare*, *e.g.*, 38 U.S.C. § 5103A (captioned "Duty to assist claimants," obligating VA to "make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim" for veterans' benefits)[86] *with* 29

---

Calling attention to workers hurt by trade is uncomfortable for free traders. They prefer to focus on benefits of low-cost imports and high-paying export jobs. But the only way to persuade the public and politicians not to erect barriers to globalization and trade is to equip young workers to compete and protect older workers who are harmed. Creating programs with a few votes in Congress, and then botching the execution, doesn't help.

David Wessel, "Aid to Workers Hurt by Trade Comes in Trickle," *Wall Street Journal*, Aug. 11, 2005, at A2.

[85]In the words of President Abraham Lincoln, the mission of the U.S. Department of Veterans Affairs is "to care for him who shall have borne the battle, and for his widow and his orphan." Abraham Lincoln (March 4, 1865).

[86]*See generally* Karnas v. Derwinski, 1 Vet. App. 308, 313 (1991) ("duty-to-assist" and "benefit-of-the-doubt" doctrines embodied in VA law "spring from a general desire to protect and

C.F.R. § 90.12 (Labor Department is obligated to "marshal all relevant facts" in making its TAA

determinations). *See also* Woodrum v. Donovan, 4 CIT at 55, 544 F. Supp. at 208-09 ("the [TAA

statute] requires the Secretary of Labor to conduct an investigation of each properly filed petition");

Int'l Molders and Allied Workers' Union, 643 F.2d at 31 ("[b]ecause of the *ex parte* nature of the

certification process, and the *remedial purpose* of the [TAA] program," Labor Department is

obligated to "conduct [its] investigation with *the utmost regard* for the interest of the petitioning

workers") (emphases added); IBM I, 29 CIT at ____, 387 F. Supp. 2d at 1351 (rejecting Labor

Department's argument that because the workers did not allege certain facts, agency was not

obligated to make further inquiry, and holding that – to the contrary – "*it is incumbent upon Labor

to take the lead* in pursuing the relevant facts") (emphasis added); Hawkins Oil & Gas II, 17 CIT

---

do justice to the veteran who has, often at great personal cost, served our country"), *overruled on
other grounds*, Kuzma v. Principi, 341 F.3d 1327, 1328-29 (Fed. Cir. 2003).

        *See also* Littke v. Derwinski, 1 Vet. App. 90, 91-92 (1991) (characterizing "VA's duty to
assist the veteran in developing the facts pertinent to his or her claim" as the "cornerstone of the
veterans' claims process," and emphasizing that "[t]he 'duty to assist' is neither optional nor
discretionary"); Godwin v. Derwinski, 1 Vet. App. 419, 425 (once veteran presents plausible claim,
burden shifts to VA to assist veteran in developing "*all* relevant facts, not just those for or against
the claim"); Murincsak v. Derwinski, 2 Vet. App. at 370 (same); 38 C.F.R. § 3.103(a) (VA
Statement of Policy, which acknowledges: "Proceedings before VA are *ex parte* in nature, and it
is the obligation of VA to assist a claimant in developing the facts pertinent to the claim and to
render a decision which grants every benefit that can be supported in law while protecting the
interests of the Government.").

        As Littke correctly observes:

        By assisting the claimant in developing pertinent facts, from whatever source, . . . the
        VA will more adequately fulfill its statutory and regulatory duty to assist the veteran.
        A well developed record will ensure that a fair, equitable and procedurally correct
        decision on the veteran's claim for benefits can be made.

Littke, 1 Vet. App. at 92. The same can be said of the Labor Department in TAA cases.

at 129, 814 F. Supp. at 1114 (Labor Department "has an *affirmative duty* to investigate" whether petitioning workers are eligible for TAA benefits) (citations omitted) (emphasis added); Sun Apparel I, 28 CIT at ____, 2004 WL 1875062 at * 6 ("Labor is under a *mandatory duty* to 'conduct an investigation into each properly filed petition'") (citation omitted) (emphasis added); Ameriphone, 27 CIT at ____, 288 F. Supp. 2d at 1359 (Labor Department "has an *affirmative obligation* to conduct its own independent 'factual inquiry into the nature of the work performed by the petitioners'"); Chevron I, 26 CIT at 1284-85, 245 F. Supp. 2d at 1327-28 (same).[87]

_____

[87]*Cf*. Former Employees of Sonoco Products Co. v. Chao, 372 F.3d 1291, 1296-99 (Fed. Cir. 2004) (discussing "paternalistic relationship" between VA and veterans, and rejecting notion "that a similar paternalistic relationship would be required to make it possible for Department of Labor employees to mislead an applicant" so as to warrant application of doctrine of equitable tolling in TAA cases).

As discussed above, the Labor Department's TAA mandate *vis-a-vis* trade-impacted workers is much like the VA's mandate *vis-a-vis* veterans of the armed services. The Labor Department suffers by comparison to other federal agencies as well.

For example, the U.S. Department of Commerce recently established an antidumping and countervailing duty "petition counseling and analysis unit," to help U.S. companies avail themselves of the protections of U.S. trade laws against unfair import competition. *See* "Commerce Establishes Petition Counseling Unit," BNA Int'l Trade Reporter, Sept. 30, 2004, at 1611. Thus, even as the Labor Department continues to default on its obligation to adequately *investigate* TAA petitions filed by *individual workers* (who are generally, by definition, unemployed), the Commerce Department has extended its mission (beyond the *investigation* of petitions) by creating a dedicated unit staffed by agency personnel with "a tremendous amount of experience," to affirmatively assist *companies* in the *filing* of petitions – working with those companies to "ensur[e] [that] their [antidumping and countervailing duty] petition[s] compl[y]" with statutory standards, and providing them with tariff and trade data to support their petitions. *Id*.

(The Labor Department's website does indicate that "[p]etitioners may request assistance in preparing [their TAA] petition at their [1] local One-Stop Career Center or by contacting their [2] State Dislocated Worker Unit, [3] Employment Security Agency or [4] *the DTAA* [the Labor Department's "Division of Trade Adjustment Assistance"] in Washington, D.C." (Emphasis added.) It is telling, however, that the Labor Department placed itself dead last on that list of potential resources; and, in any event, the agency's website provides no direct contact information for the

Congress designed TAA as a *remedial* program, recognizing that petitioning workers would be (by definition) traumatized by the loss of their livelihood; that some might not be highly-educated; that virtually all would be *pro se*; that none would have any mastery of the complex statutory and regulatory scheme; and that the agency's process would be largely *ex parte*.[88] Congress did not intend the TAA petition process to be adversarial. Nor did Congress intend to cast the Labor Department as a "defender of the fund,"[89] passively sitting in judgment, ruling "thumbs up" or "thumbs down" on whatever evidence petitioning workers might manage to present.

Quite to the contrary, the Labor Department is charged with an *affirmative* obligation to *proactively* and thoroughly investigate all TAA claims filed with the agency – and, in the words of its own regulations, to "marshal all relevant facts" to make its determinations.[90] *See* 29 C.F.R. § 90.12. Indeed, the agency's investigative role is pivotal. Only the Labor Department can adequately safeguard the rights of the country's displaced workers. *See*, *e.g.*, IBM I, 29 CIT at ____, 387 F.

---

DTAA. *See generally* "Certifiably Broken," 7 U. Pa. J. Lab. & Emp. L. at 819 n.99 (criticizing information provided by Labor Department to assist workers interested in applying for TAA benefits). Moreover, review of the administrative records in TAA cases filed with the court has disclosed no case in which DTAA provided assistance to petitioning workers in the preparation of their petition. Indeed, given that the Labor Department is routinely failing to even properly *investigate* TAA petitions, it is unclear what assistance, if any, the agency could provide to workers in the preparation of their petitions.)

[88]*See*, *e.g.*, McCarthy at 15 ("In trade adjustment assistance cases, the administrative proceedings are *ex parte* in nature. The petitioners are usually unrepresented by counsel.").

[89]*Compare* 38 C.F.R. § 3.103(a) ("it is the obligation of VA . . . to render a decision *which grants every benefit that can be supported in law while protecting the interests of the Government*") (emphasis added).

[90]"Marshal" is a verb with a very active, orderly – indeed, militant and militaristic – connotation. Its synonyms include "mobilize," "muster," "rally," and "deploy." *See*, *e.g.*, Roget's II: The New Thesaurus, Third Edition (2003).

Supp. 2d at 1351 (observing that petitioning workers cannot reasonably be expected to have knowledge of the "sometimes esoteric criteria" for TAA certification).[91]

If the Labor Department shirks its investigative duties, the TAA program is doomed to fail. True, some few companies and union "locals" may be motivated by a sense of corporate or social responsibility to take the initiative and actively assist displaced workers in filing TAA claims and proving their cases. But many – if not most – employers have neither the inclination nor the resources to do so.[92] And organized labor basically *wants* TAA to fail.[93]

In this case, as in so many other TAA cases appealed to the court in recent years, the Workers' persistence ultimately paid off. However belatedly, the Labor Department eventually certified them as eligible to apply for TAA benefits. Yet it would be a grave mistake to characterize this as a case where the system "worked."

Congress never intended the process of petitioning for TAA benefits to be a war of attrition. There is no "happy ending" here. The extreme tardiness of the Labor Department's affirmative determination robbed it of much of its practical value to the Workers and other former BMC employees. But, for whatever relief it has yet afforded those who need and deserve it, the agency's

---

[91]*Cf*. Akles v. Derwinski, 1 Vet. App. 118, 121 (1991) (rejecting as absurd and inconsistent with agency's "duty to assist" the VA's argument that a claimant should be obligated to "specify with precision the statutory provisions or the corresponding regulations under which he is seeking benefits"; contrary to agency's contention, *claimants should not be required "to develop expertise in laws and regulations on veterans benefits* before receiving any compensation") (emphasis added).

[92]*See generally* section II.B, *supra* (cataloguing various motivations for employers' failures to cooperate in TAA investigations). *But cf*. Ericsson I, 28 CIT at ____, ____, 2004 WL 2491651 at ** 3-4, 7 (representative of employer filed the TAA petition on behalf of workers, although she subsequently failed and refused to cooperate with investigation).

[93]*See generally* n.3, *supra* (discussing organized labor's antipathy to TAA).

Revised Determination on Remand is hereby sustained.  *See* 69 Fed. Reg. 76,783 (Dec. 22, 2004).

Judgment will enter accordingly.



Delissa A. Ridgway, Judge

Decided: August 31, 2006
          New York, New York